# EXHIBIT 1

**Ausfertigung**



**Eingegangen**

0 9. April 2015

MORRISON | FOERSTER

# Landgericht Berlin

## Im Namen des Volkes

### Urteil

Geschäftsnummer: 15 O 62/15          verkündet am: 31.03.2015
                                                    Großmann
                                                    Justizbeschäftigte

In dem Verfahren auf Erlass einer einstweiligen Verfügung

1. des Herrn Matthew R. Salinger,
   handelnd unter der Geschäftsbezeichnung
   „The J.D. Salinger Literary Trust",
   Suite #202,
   Trustee, JDLT, 5 River Road, Wilton, CT 06897,
   Vereinigte Staaten,

2. der Frau Colleen M. Salinger,
   handelnd unter der Geschäftsbezeichnung
   „The J.D. Salinger Literary Trust",
   Trustee, JDLT, 301 Lang Road, Cornish, NH 03745,
   Vereinigte Staaten,

                                                    Antragsteller,

- Verfahrensbevollmächtigte: Rechtsanwälte
  Morrison Foerster,
  Potsdamer Platz 1, 10785 Berlin -

gegen

die Piper Verlag GmbH,
vertreten durch die Geschäftsführer
Marcel Hartges, Hans-Joachim Harmann
und Christian Mathias Schumacher-Gebler,
Georgenstraße 4, 80799 München,

                                                    Antragsgegnerin,

- Verfahrensbevollmächtigte: Rechtsanwälte
  Senfft Kersten Nabert van Eendenburg,
  Schlüterstraße 6, 20146 Hamburg -

ZP 550

2

hat die Zivilkammer 15 des Landgerichts Berlin in Berlin - Mitte, Littenstraße 12-17, 10179 Berlin,
auf die mündliche Verhandlung vom 10. März 2015 durch den Vorsitzenden Richter am Land-
gericht Meyer-Schäfer und die Richter am Landgericht Schaber und Raddatz
für Recht erkannt:

1. Der Antragsgegnerin wird bei Meidung eines für jeden Fall der Zuwiderhandlung fälligen
   Ordnungsgeldes bis zu 250.000,00 Euro, ersatzweise Ordnungshaft bis zu sechs Monaten
   oder Ordnungshaft bis zu sechs Monaten, diese zu vollziehen an ihrem Geschäftsführer,

   **untersagt,**

   eine deutsche Übersetzung der Werke

   „The Young Folks", „Go See Eddie" und „Once a Week Won´t Kill You"
   von J. D. Salinger

   in Deutschland zu vervielfältigen und/oder vervielfältigen zu lassen,
   zu verbreiten und/oder verbreiten zu lassen, öffentlich zugänglich zu machen
   und/oder öffentlich zugänglich machen zu lassen,

   insbesondere in dem Buch

   „Die jungen Leute – Drei Stories"

   als Druckausgabe (ISBN: 978-3-4923-05698-4)

   zu vervielfältigen und/oder vervielfältigen zu lassen,
   zu verbreiten und/oder verbreiten zu lassen

   sowie im gleichnamigen E-Book (ISBN: 978-3-492-97053-2)

   zu vervielfältigen und/oder vervielfältigen zu lassen, öffentlich zugänglich zu machen
   und/oder öffentlich zugänglich machen zu lassen.

2. Die Antragsgegnerin wird dazu verurteilt, an den Buchhandel bereits ausgelieferte
   Vervielfältigungsstücke der Übersetzungen gemäß Ziffer 1 zurückzurufen.

3. Die Kosten des Verfahrens werden gegeneinander aufgehoben.


**Tatbestand**


Die Parteien streiten um die Berechtigung der Antragsgegnerin, Texte des im Januar 2010 ver-
storbenen Autoren J. D. Salinger in einem deutschsprachigen Buch zu verwerten.

Jerome David Salinger ist ein amerikanischer Autor literarischer Werke. 1965 publizierte er zuletzt einen literarischen Text. Ihm war es wichtig, seine Person und seine Werke von der Öffentlichkeit fern zu halten. Streitgegenständlich sind die in den 1940er-Jahren verfassten Kurzgeschichten „The Young Folks", „Go See Eddie" und „Once a Week Won´t Kill You", die J. D. Salinger in den 1940er-Jahren verfasste (im Folgenden kurz: „die Geschichten"). Diese Texte wurden 1940 bzw. 1944 jeweils einmalig in US-amerikanischen Magazinen veröffentlicht (Anlage Ast 3). Zwei der Geschichten wurden damals gar nicht im Register des US Copyright Office registriert, eine Registrierung wurde nach Ablauf der Schutzfrist (1968) nicht verlängert.

J. D. Salinger gründete am 24. Juli 2008 den „J. D. Salinger Literary Trust" als „Hilfsmittel der Verwaltung des literarischen Eigentums (...) gemeinsam mit sonstigem Eigentum, das vom Treugeber oder einer anderen Person auf die Trustee übertragen werden kann, als separater Trust gemäß den Bestimmungen dieser Urkunde" (Arbeitsübersetzung zur Anlage Ast 1, Auszug der Gründungsurkunde). Bis zu seinem Tod hatte der Autor sich selbst als Treuhänder des Trusts (Trustee) eingesetzt. In der Gründungsurkunde war bestimmt, dass danach immer zwei Trustees wirken sollten, wobei J. D. Salinger seine Ehefrau und seinen Sohn Matthew Robert Salinger als Co-Trustees bestimmte. Am 15. Oktober 2008 unterschrieb J. D. Salinger ein „Assignment of Literary Property", in dem er eine umfassende Rechteübertragung auf den Trustee erklärte (Anlagen Ast 4 und Ast 28).

Die Antragstellerin ist die Witwe des J. D. Salinger, der Antragsteller sein Sohn, beide sind die amtierenden Trustees des Trusts.

Die Antragsgegnerin ist ein deutscher Verlag. Sie kündigte – nach ihrer Behauptung ab November 2014 - auf ihrer Webseite (www.piper.de) das Erscheinen eines Buches mit dem Titel „J. D. Salinger – Die jungen Leute – Drei Stories" mit Übersetzungen der Geschichten in deutscher Sprache an, zunächst für den 9. März 2015, dann für den 16. Februar 2015 (Anlage Ast 9). Das Erscheinen dieses Buchs wurde auch auf der Internet-Handelsplattform

ZP 550

4

www.amazon.de sowie in Österreich und in der Schweiz angekündigt (Anlagen Ast 9 - Ast 11). Das Buch erschien als Druckversion und als E-Book am 16. Februar 2015 auf dem deutschen Markt. Weder der Autor noch die Antragsteller stimmten dem zu.

Mit Schriftsatz vom 9. Januar 2015 wies der Trust die Antragsgegnerin darauf hin, er sei Inhaber der Urheberrechte an den Geschichten, habe keine Einwilligung erteilt und behalte sich sämtliche Ansprüche vor (Anlage Ast 12). Die Antragsgegnerin berief sich in ihrem Schriftsatz vom 16. Januar 2015 auf einen Lizenzvertrag „mit amerikanischen Rechtegebern" und deren Zusage, über alle erforderlichen Rechte zu verfügen; sie teilte mit, in erster Linie an einer Verbreitung des Buches interessiert, jedoch gesprächsbereit zu sein (Anlage Ast 14). Beide Seiten telefonierten miteinander. Mit Schriftsatz vom 5. Februar 2015 mahnten die Antragsteller die Antragsgegnerin fruchtlos ab (Anlagen Ast 15 – Ast 17).

Bei dem Rechtegeber, auf den sich die Antragsgegnerin beruft, handelt es sich um den US-amerikanischen Verlag Devault-Graves Agency. Dieser veröffentlichte im Juli 2014 die Geschichten in den Vereinigten Staaten in dem Buch „Three Early Stories" erneut (Anlage AG 1). Der Verlag hat seine Herausgeberschaft dieser Textsammlung in den USA urheberrechtlich registrieren lassen. Die Parteien gehen übereinstimmend davon aus, dass die Geschichten in den USA inzwischen gemeinfrei geworden sind. Die Antragsteller sehen keine rechtliche Handhabe gegen den Verlag Devault-Graves Agency und ihre Bemühungen, sich mit diesem außergerichtlich zu einigen, blieben erfolglos.

Die Antragsteller behaupten, sie selbst hätten erstmals am 21. und 22. Dezember 2014 davon erfahren, dass die Antragsgegnerin eine deutsche Übersetzung der Geschichten veröffentlichen will.

Die Antragsteller berufen sich zur Glaubhaftmachung auf die schriftlichen Erklärungen des Antragstellers vom 4. und 5. Februar 2015 (Anlagen Ast. 2 und Ast 13/Ast 21), der Rechtsanwältin

Cynthia S. Arato vom 5. Februar 2015 (Anlage Ast 13/Ast 21) und des Rechtsanwalts Thomas S. Csatari vom 24. Februar 2015 (Anlage Ast 25)

Die Antragsteller sind der Ansicht: Sie als Trustees seien nach Maßgabe des Trust-Rechts von New Hampshire die Inhaber der Urheberrechte an den Geschichten. Die geltend gemachten Ansprüche stünden ihnen nach §§ 97 Abs. 1, 23 Abs. 1 UrhG, die nach dem Schutzlandprinzip hier anzuwenden seien, zu.

Die Antragsteller haben mit ihrer Antragsschrift vom 6. Februar 2015 beantragt:

> 1. Es der Antragsgegnerin unter Androhung gesetzlicher Ordnungsmittel
>    zu untersagen,
>    eine deutsche Übersetzung der Werke
>    „The Young Folks", „Go See Eddie" und „Once a Week Won´t Kill You"
>    von J. D. Salinger in Deutschland, Österreich und/oder der Schweiz
>    zu veröffentlichen und/oder veröffentlichen zu lassen, zu verwerten
>    und/oder verwerten zu lassen,
>
>    insbesondere in dem Buch „Die jungen Leute – Drei Stories"
>    als Druckausgabe (ISBN: 978-3-4923-05698-4)
>    zu vervielfältigen und/oder vervielfältigen zu lassen, zu verbreiten
>    und/oder verbreiten zu lassen
>    sowie im gleichnamigen E-Book (ISBN: 978-3-492-97053-2) zu vervielfältigen
>    und/oder vervielfältigen zu lassen, öffentlich zugänglich zu machen
>    und/oder öffentlich zugänglich machen zu lassen und/oder für den Vertrieb
>    der Übersetzungen zu werben oder werben zu lassen;
>
> 2. die Antragsgegnerin zu verpflichten, an den Buchhandel bereits ausgelieferte
>    Vervielfältigungsstücke der Übersetzungen gemäß Ziffer 1 zurückzurufen
>    und Angebote zum Download der Übersetzungen als E-Book gemäß Ziffer 1
>    aus dem Internet zu entfernen und/oder entfernen zu lassen.

Mit Schriftsatz vom 26. Februar 2015 haben die Antragsteller ihre Anträge wie folgt gefasst:

> 1. Es der Antragsgegnerin unter Androhung gesetzlicher Ordnungsmittel
>    zu untersagen,
>    eine deutsche Übersetzung der Werke
>    „The Young Folks", „Go See Eddie" und „Once a Week Won´t Kill You"
>    von J. D. Salinger in Deutschland, Österreich und/oder der Schweiz
>    zu vervielfältigen und/oder vervielfältigen zu lassen, zu verbreiten
>    und/oder verbreiten zu lassen, öffentlich zugänglich zu machen
>    und/oder öffentlich zugänglich machen zu lassen,

insbesondere in dem Buch „Die jungen Leute – Drei Stories"
als Druckausgabe (ISBN: 978-3-4923-05698-4)
zu vervielfältigen und/oder vervielfältigen zu lassen, zu verbreiten
und/oder verbreiten zu lassen
sowie im gleichnamigen E-Book (ISBN: 978-3-492-97053-2)
zu vervielfältigen und/oder vervielfältigen zu lassen, öffentlich zugänglich
zu machen und/oder öffentlich zugänglich machen zu lassen;

2. die Antragsgegnerin zu verpflichten, die Veröffentlichung der deutschen Über-
setzung der Werke
„The Young Folks", „Go See Eddie" und „Once a Week Won't Kill You"
von J. D. Salinger zu beseitigen.

3. die Antragsgegnerin zu verpflichten, an den Buchhandel bereits ausgelieferte
Vervielfältigungsstücke der Übersetzungen gemäß Ziffer 1 zurückzurufen
und Angebote zum Download der Übersetzungen als E-Book gemäß Ziffer 1
aus dem Internet zu entfernen und/oder entfernen zu lassen.

Im Verhandlungstermin haben die Antragsteller unter Antragszurückrahme im Übrigen
die folgenden Anträge gestellt:

1. Es der Antragsgegnerin unter Androhung gesetzlicher Ordnungsmittel
zu untersagen,
eine deutsche Übersetzung der Werke
„The Young Folks", „Go See Eddie" und „Once a Week Won't Kill You"
von J. D. Salinger in Deutschland zu vervielfältigen und/oder vervielfältigen
zu lassen, zu verbreiten und/oder verbreiten zu lassen, öffentlich zugänglich
zu machen und/oder öffentlich zugänglich machen zu lassen,

insbesondere in dem Buch „Die jungen Leute – Drei Stories" als Druckausgabe
(ISBN: 978-3-4923-05698-4) zu vervielfältigen und/oder vervielfältigen zu lassen,
zu verbreiten und/oder verbreiten zu lassen
sowie im gleichnamigen E-Book (ISBN: 978-3-492-97053-2) zu vervielfältigen
und/oder vervielfältigen zu lassen, öffentlich zugänglich zu machen und/oder
öffentlich zugänglich machen zu lassen;

2. (entfällt)

3. die Antragsgegnerin unter Androhung gesetzlicher Ordnungsmittel zu verpflichten,
an den Buchhandel bereits ausgelieferte Vervielfältigungsstücke der Über-
setzungen gemäß Ziffer 1 zurückzurufen.

Die Antragsgegnerin beantragt,

den Antrag auf Erlass einer einstweiligen Verfügung zurückzuweisen,

hilfsweise,

die einstweilige Verfügung auf die noch nicht ausgedruckten und aufgebundenen Exemplare zu beschränken.

Die Antragsgegnerin ist der Ansicht, es bestehe kein Verfügungsgrund, weil die Antragsteller bereits seit längerer Zeit von der beabsichtigten Publikation gewusst hätten, mit der Geltendmachung von Unterlassungsansprüchen aber absichtlich zugewartet hätten, bis das Buch produziert gewesen sei. Dem Verfügungsanspruch tritt die Antragsgegnerin in jeglicher Hinsicht entgegen.

Wegen der weiteren Einzelheiten des wechselseitigen Vorbringens wird auf den Inhalt der Schriftsätze (einschließlich der verbundenen Schutzschrift – 15 AR 28/15 - vom 6. Februar 2015) nebst Anlagen verwiesen.

Die Parteien haben in der mündlichen Verhandlung einen Vergleich mit beiderseitigem Widerrufsvorbehalt bis zum Ablauf des 11. März 2015 geschlossen. Die Antragsteller haben diesen Vergleich mit einem am 11. März 2015 bei Gericht eingegangenem Schriftsatz widerrufen.

ZP 550

## Entscheidungsgründe

Über den Antrag auf Erlass einer einstweiligen Verfügung war aufgrund der mündlichen Verhandlung durch Urteil zu entscheiden, §§ 936, 921 Abs. 1 ZPO, nachdem der Vergleich widerrufen worden ist.

Der Antrag ist in dem zuletzt noch gestellten Umfang zulässig und begründet.

Der Antrag unterfällt der deutschen Gerichtsbarkeit. Er richtet sich gegen eine inländische Person mit inländischem Gerichtsstand, die nach der Behauptung der Antragsteller deren für Deutschland bestehende Urheberrechte verletzt haben soll (vgl. LG München I – 7 O 11335/00 -, Urteil vom 24. August 2000, ZUM-RD 2002, 21 ff.).

Das Landgericht Berlin ist international und örtlich zuständig. Der Antrag betrifft Urheberrechtsverletzungen durch eine in Deutschland agierende Antragsgegnerin, mithin in Deutschland begangene unerlaubte Handlungen. Die internationale Zuständigkeit deutscher Gerichte folgt aus § 32 ZPO. Die örtliche Zuständigkeit des Landgerichts Berlin folgt aus derselben Norm. Das streitgegenständliche Buch wird auch in Berlin bestimmungsgemäß verbreitet und öffentlich zugänglich gemacht. Es ist zwar nichts dafür ersichtlich, dass das Buch auch in Berlin vervielfältigt wird, diese Handlung folgt als Vorbereitung aber im Interesse eines effektiven, einheitlichen Rechtsschutzes der örtlichen Zuständigkeit der wirtschaftlichen Verwertung.

Den Antragstellern steht gegen die Antragsgegnerin ein Verfügungsanspruch zu.

Auf den Fall ist das deutsche Recht anzuwenden. Die Antragsteller beanspruchen urheberrechtlichen Schutz für Deutschland. Die Frage, ob Ansprüche im Falle der Verletzung eines Urheberrechts bestehen, ist grundsätzlich nach dem Recht des Schutzlandes, also des Staates, für

dessen Gebiet der Schutz in Anspruch genommen wird, zu beantworten (BGH – I ZR 49/13 -, Urteil vom 26. Februar 2014 – Tarzan).

Nach deutschem Recht beurteilt sich daher die Frage, ob das Werk schutzfähig ist. Diese von Amts wegen vorzunehmende Prüfung haben die Antragsteller dem Gericht zwar nicht ermöglicht, weil sie das Werk nicht vorgelegt haben (vgl. Schulze in Dreier/Schulze, UrhG, 4. Auflage 2013, § 2, Rn. 70). Die Entscheidung über die Schutzfähigkeit unterliegt auch nicht der Disposition der Parteien. Deren übereinstimmende Einschätzung, die Schutzfähigkeit des Werkes nicht in Frage zu stellen, kann aber als Indiz für die hinreichende Individualität gewertet werden. Da der Autor zudem ein anerkannter Schriftsteller ist, ist die urheberrechtliche Schutzfähigkeit seiner drei Geschichten als Sprachwerk im Sinne des § 2 Abs. 1 Nr. 1 UrhG anzunehmen.

Für dieses Werk läuft in Deutschland noch die Schutzfrist. Auch die Schutzdauer des Werks ist nach deutschem Recht zu beurteilen.

Einer Berufung auf § 121 Abs. 1 S. 2 UrhG steht entgegen, dass die drei Geschichten bereits mehr als 30 Tage vorher in den USA erschienen sind, zuerst in den 1940er-Jahren und dann wieder im Juli 2014. § 121 Abs. 1 S. 2 UrhG stellt eine Übersetzung des Werkes zwar dem Original-werk gleich, weil mit der Übersetzung zugleich auch das ursprüngliche Werk erschienen ist (Dreier in Dreier/Schulze, UrhG, 4. Auflage 2013, §121, Rn. 3; Wandtke/Bullinger/v. Welser, UrhR, 4. Auflage 2014, § 121, Rn. 2). Dies gilt aber nur „mit der gleichen Einschränkung" nach § 121 Abs. 1 S. 1 UrhG, nämlich, dass das Werk oder eine Übersetzung des Werkes nicht früher als 30 Tage vor dem Erscheinen (hier: der Übersetzung) im Geltungsbereich des UrhG außerhalb dieses Gebietes erschienen ist. Das Werk ist auch dann nicht erstmals (oder innerhalb der 30 Tage-Frist) im Geltungsbereich des UrhG erschienen, wenn es hier zwar erstmals als deutsche Über-setzung, anderswo aber bereits früher in der Originalsprache erschienen ist, denn die Über-setzung wird dem Originalwerk nur gleichgestellt, tritt aber nicht eigenständig neben dieses. Eine Ausnahme gilt zwar für den Schutz der Urheberpersönlichkeitsrechte nach §§ 12 – 14 UrhG, den

ZP 550

ausländische Staatsangehörige nach § 121 Abs. 6 UrhG für alle ihre Werke beanspruchen dürfen, auch wenn die Voraussetzungen der Absätze 1 bis 5 des § 121 UrhG nicht vorliegen (vgl. Dreier in Dreier/Schulze, UrhG, 4. Auflage 2013, §121, Rn. 19). Darauf kommt es hier jedenfalls aber nach der Rücknahme des Antrags zu 2. nicht mehr an.

Für den urheberrechtlichen Schutz der Antragsteller kommt es vielmehr auf den Inhalt der Staatsverträge an, § 121 Abs. 4 S. 1 UrhG.

Nach Art. 1 des fortgeltenden deutsch-amerikanischen Abkommens von 1892 sollen die Bürger der USA im Deutschen Reich den Schutz des Urheberrechts bezüglich der Werke der Literatur gegen unbefugte Nachbildung auf derselben Grundlage genießen, wie solcher den Reichsangehörigen gesetzlich zusteht. Den Angehörigen der USA wird danach in Deutschland urheberrechtlicher Schutz nach inländischem Recht gewährt. Auch die Schutzdauer im Inland richtet sich ausschließlich nach inländischem Recht, es kommt also nicht darauf an, ob und gegebenenfalls wie lange das fragliche Werk in den USA noch geschützt ist (BGH – I ZR 49/13 -, Urteil vom 26. Februar 2014 – Tarzan). Als die Geschichten in den 1940er-Jahren entstanden (ihrem Erscheinen nach im Zeitraum zwischen 1940 und 1944, ohne dass hier es auf den genauen Zeitpunkt ankommt), galt das Gesetz betreffend das Urheberrecht an Werken der Literatur und der Tonkunst (LUG) vom 19. Juni 1901 in der Fassung vom 22. Mai 1910 in Verbindung mit dem Schutzfristenverlängerungsgesetz vom 13. Dezember 1934. Gemäß § 29 S. 1 LUG endete der Schutz des Urheberrechts, wenn seit dem Tod des Urhebers dreißig Jahre und außerdem seit der ersten Veröffentlichung des Werkes zehn Jahre abgelaufen waren. Diese Frist wurde 1934 auf fünfzig Jahre verlängert. Das Urheberrecht entsteht nach deutschem Rechte automatisch mit der Schaffung des Werkes. Danach waren die Geschichten zur Zeit ihres Entstehens ab sofort und 50 Jahre p. m. a. geschützt, also bis zum Jahr 2060, wobei sich die Frist nach § 34 LUG nach dem Ablauf des Todesjahres und nicht nach dem Todestag berechnen, d. h. der Schutz gilt bis zum Ablauf des Jahres 2060. Auf eine weitere Verlängerung nach §§ 64 Abs. 1, 129 Abs. 1 S. 1 UrhG a. F. kommt es für die Entscheidung nicht an.

Das Übereinkommen von 1892 wird durch das Welturheberrechtsabkommen (WUA) überlagert. Dieses ist für Deutschland und die USA am 16. September 1955 in Kraft getreten. Das Abkommen ist auf die verfahrensgegenständlichen Werke anwendbar, da diese beim Inkrafttreten des Abkommens in Deutschland als dem Vertragsstaat, in dem der Schutz beansprucht wird, geschützt war, vgl. Art. VII WUA. Es kann dahinstehen, ob die Bestimmungen des WUA von den Bestimmungen des Übereinkommens von 1892 im vorliegenden Fall zu einer geringeren Schutzdauer führen und diesem daher nach Art. XIX S. 2 WUA vorgehen könnten. Nach Art. XIX S. 3 WUA bleiben jedenfalls die Rechte an einem Werk, die in einem diesem Abkommen angehörenden Staat aufgrund bestehender Verträge oder Vereinbarungen erworben worden sind, bevor dieses Abkommen für diesen Staat in Kraft getreten ist, unberührt. Dazu gehören die Rechte an einem Werk, die in Deutschland aufgrund des Übereinkommens von 1892 erworben worden sind, bevor das WUA für Deutschland in Kraft getreten ist. Diese Rechte bleiben in ihrem Bestand erhalten, zu diesem Bestand gehört auch die Schutzdauer des Rechts (BGH – I ZR 49/13 -, Urteil vom 26. Februar 2014 – Tarzan). Am 16. September 1955 bestand bereits der oben genannte Urheberrechtsschutz an den Geschichten. Dieser wird durch das WUA nicht berührt.

Die Revidierte Berner Übereinkunft (RBÜ) ist im Verhältnis der Bundesrepublik Deutschland zu den USA in ihrer am 24. Juli 1974 in Paris revidierten Fassung anwendbar. Sie ist für die Bundesrepublik Deutschland am 10. Oktober 1974 und für die USA am 1. März 1989 in Kraft getreten. Das WUA räumt der RBÜ den Vorrang ein und diese ihrerseits dem Abkommen von 1892. Nach Art. 20 S. 2 RBÜ bleiben die Bestimmungen bestehender Abkommen anwendbar, die den Urhebern Rechte verleihen, die über die ihnen durch die RBÜ gewährten Rechte hinausgehen oder andere Bestimmungen enthalten, die der RBÜ nicht zuwider laufen. Zu diesen Bestimmungen gehört Art. 1 des Abkommens von 1892 (BGH – I ZR 49/13 -, Urteil vom 26. Februar 2014 – Tarzan). Es kommt daher hier nicht darauf an, dass die Werke nach Ansicht der Kammer auch nach Maßgabe des RBÜ noch Schutz genießen, so dass sich dazu an dieser Stelle weitere Ausführungen erübrigen. Festzuhalten bleibt, dass die Schutzfrist für die Werke in Deutschland andauert.

Die Antragsteller sind als Trustees berechtigt, die Urheberrechte geltend zu machen.

Antragsteller ist nicht der Trust, sondern sind die beiden Trustees. Diese machen Rechte im eige-
nen Namen geltend. Soweit es in dem Schreiben vom 9. Januar 2015 noch heißt, die Urheber-
rechte seien auf den Trust übertragen worden, ist im nächsten Schriftsatz, der Abmahnung vom
5. Februar 2015, klargestellt worden, dass es tatsächlich um die Trustees geht (Anlage K 15). Die
Antragsteller haben im Schriftsatz vom 26. Februar 2015 zu III. hinreichend dargetan und glaub-
haft gemacht, dass der Trust keine juristische Person ist, sondern die Rechte dem Trustee über-
tragen werden, der diese im eigenen Namen und nicht als Vertreter des Trusts wahrnimmt. Dies
folgt aus dem insoweit maßgeblichen Recht des US-Bundesstaats New Hampshire, insbesondere
2A Corpus Juris Secundum Agency § 24 und § 564-B: 8-801 und 8-816 Common Law of Trusts
(Anlagen Ast 23 und Ast 24), was die Antragsteller durch die eidesstattliche Versicherung des
örtlichen Rechtsanwalts Csatari vom 24. Februar 2015 (Anlage Ast 25) glaubhaft gemacht haben.
Die Antragsgegnerin hat sich damit inhaltlich nicht näher auseinandergesetzt. Für die Rechte-
übertragung im vorliegenden Fall ist danach folgendes maßgeblich: Am 24. Juli 2008 hat
J. D. Salinger den „J. D. Salinger Literary Trust" gegründet. In der Einleitung zur Gründungsur-
kunde erklärt J. D. Salinger als Trustee, von sich als Treugeber, das in einer Anlage A aufgeführte
Eigentum erhalten zu haben. In Artikel I ist vorgesehen, dass weiteres Eigentum auf die Trustees
übertragen werden kann. Demnach sollten die Rechte nicht dem Trust selbst, sondern dem/den
jeweiligen Trustee/s übertragen werden. Da diese Urkunde nur die Übertragung einzelner Eigen-
tumsgegenstände enthält und weitere Übertragung ausdrücklich vorsieht und die (als Ast 26 vor-
gelegte) „annexed Schedule A" nur den Verweis „see asset list", aber keine solche Liste mit dem
Stand 24. Juli 2008 enthält, ist nicht festzustellen, ob die drei verfahrensgegenständlichen Ge-
schichten davon bereits erfasst waren. Dies kann aber dahinstehen. Jedenfalls mit der Abtre-
tungserklärung vom 15. Oktober 2008 (Anlage Ast 4/28) hat J. D. Salinger eine umfassende
Rechteabtretung an den Trustee vorgenommen. Diese Abtretung erfasste auch solche Urheber-
rechte, derer sich der Zedent nicht bewusst war, wie etwa nach ausländischem Recht im Ausland.
Die Erklärung ist erkennbar auf Lückenlosigkeit angelegt. Ihr ist auch kein Anhaltspunkt zu ent-
nehmen, dass J. D. Salinger solche Werke ausklammern wollte, die zur Zeit der Abtretung in den

USA bereits gemeinfrei geworden waren. Wie bereits ausgeführt, war ein urheberrechtlicher Schutz solcher Werke im Ausland gleichwohl noch möglich und auch sonst ist kein Grund ersichtlich, diese Werke dem Trust vorzuenthalten. Dass die Antragsteller die amtierenden Trustees sind, ist unstreitig. Sie dürfen demnach die Urheberrechte an den Geschichten im eigenen Namen als Trustees wahrnehmen.

Der Antrag zu 1. auf Unterlassung ist nach §§ 97 Abs. 1 S. 1, 23 S. 1, 15 Abs. 1 Nr. 1 und 2 und Abs. 2 S. 2 Nr. 2, 16 Abs. 1, 17 Abs. 1 und 19 a UrhG begründet.

Die deutsche Übersetzung der Geschichten ist eine Bearbeitung im Sinne des § 23 S. 1 UrhG. Die Veröffentlichung und Verwertung dieser Bearbeitung setzt die Einwilligung des Urhebers, hier der Antragsteller, voraus. Die Antragsgegnerin hat die Bearbeitung vervielfältigt (§ 16 Abs. 1 UrhG), verbreitet (§ 17 Abs. 1 UrhG, Druckausgabe) und öffentlich zugänglich gemacht (§ 19 a UrhG, E-Book), und zwar so, wie unter „insbesondere" angegeben, ohne dass damit weitere Verwertungen ausgeschlossen werden. Für eine Begehungsgefahr weiterer solcher Verwertungshandlungen bedarf es hier keiner konkreten Anhaltspunkte. Es ist keineswegs unüblich, ein Buch nach seiner Erstveröffentlichung als gebundene Ausgabe auch in weiteren Formen, etwa als Taschenbuch oder Lizenzausgabe, zu verwerten. Die Antragsgegnerin hat keinen Anhaltspunkt dafür dargetan, dass dies hier ausnahmsweise auszuschließen ist.

Die Antragsgegnerin handelt rechtswidrig. Eine Einwilligung des Urhebers oder der Antragsteller fehlt der Antragsgegnerin. Eine Lizenz des Verlags Devault-Graves Agency mag dessen etwaige Rechte an seiner neuen amerikanischen Buchausgabe als solcher betreffen, kann hier aber nicht die Rechte der Antragsteller gegenstandslos machen.

Der Anspruch besteht verschuldensunabhängig. Aus Sicht der Kammer hat die Antragsgegnerin ohnehin jedenfalls fahrlässig gehandelt. Es oblag ihr, sich vor der Bearbeitung, Veröffentlichung und Verwertung gründlich über ihre Berechtigung zu vergewissern. Dies gilt umso mehr, als ihre

ZP 550

14

eigenen deutschen Rechtsanwälte die Rechtsmaterie in der Schutzschrift als zu komplex für ein Eilverfahren, mithin als besonders schwierig, ansehen. Die Antragsgegnerin hat sich – soweit es ihrem Vortrag zu entnehmen ist – in dieser Lage darauf beschränkt, einer Erklärung ihrer Lizenzgeberin zu vertrauen. Was sie zu der Annahme berechtigte, der US-amerikanische Verlag habe die komplexe Urheberrechtslage in Deutschland zuverlässig prüfen und belastbar klären können, hat sie offen gelassen. Letztlich kommt es darauf für die Entscheidung aber nicht an.

Der Antrag zu 1. ist in seiner zuletzt angekündigten Fassung und bezogen auf Deutschland daher begründet, Art. 97 Abs. 1 UrhG.

Das Unterlassungsgebot war dabei nicht auf die noch nicht gedruckten oder gebundenen Bücher zu beschränken. Eine solche Beschränkung ließe das Eilverfahren faktisch leer laufen und vereitelte einen effektiven Rechtsschutz der Antragsteller. Die Antragsgegnerin verdient einen solchen Schutz nicht, wie sich aus den Ausführungen zum Verschulden und zu § 98 Abs. 4 UrhG ergibt.

Der ursprüngliche Antrag zu 1. enthielt ferner das Begehren, auch das Bewerben (lassen) zu untersagen. Dieses Ziel verfolgen die Antragsteller nicht mehr. Sie haben damit ihren Antrag zu 1. teilweise zurückgenommen.

Der ursprüngliche Antrag zu 1. enthielt im Obersatz die Handlungsformen veröffentlichen und verwerten. Die Antragsteller haben damit auf die in § 23 S. 1 UrhG genannten Begriffe abgestellt und auf den Hinweis des Gerichts, dass die Verwertungsformen gemäß §§ 15 ff. UrhG im Antrag zu konkretisieren seien, eine Klarstellung ihres Begehrens vorgenommen, die mit der Antragsbegründung korrespondiert. Dass die Antragsteller mit dem allgemeinen Begriff der Verwertung darüber hinaus bestimmte weitere oder gar alle nur denkbaren Verwertungsformen verboten sehen wollten, ist ihrer Antragsbegründung dagegen nicht zu entnehmen. Es handelt sich demnach insoweit nur um eine Klarstellung und nicht um eine teilweise Rücknahme des Antrags.

Die Antragsteller haben mit ihrem Antrag zu 1. ursprünglich Schutz für die Länder Deutschland, Österreich und Schweiz gesucht, sich dann aber auf Deutschland beschränkt. Dies war im Tenor entsprechend auszudrücken, § 308 Abs. 1 S. 1 ZPO. Hinsichtlich eines Schutzes in Österreich und in der Schweiz haben die Antragsteller ihren Antrag zurückgenommen.

Schließlich haben die Antragsteller mit ihrem ursprünglichen Antrag zu 1. auch die Veröffentlichung des Buches untersagen lassen wollen. Diesen Antrag haben sie nach dem Erscheinen des Buches in die Fassung ihres neuen Antrags zu 2. geändert.

Den neuen Antrag zu 2. haben die Antragsteller zurückgenommen, so dass eine Sachentscheidung obsolet geworden ist.

Den Antrag zu 3. (ursprünglich Antrag zu 2.) haben die Antragsteller hinsichtlich seines zweiten Teils (Downloadangebote) zurückgenommen.

Hinsichtlich des ersten Teils (Druckexemplare) ist der Antrag zu 3. begründet, § 98 Abs. 2 Fall 1 UrhG. Danach kann, wer das Urheberrecht oder ein anderes nach diesem Gesetz geschütztes Recht widerrechtlich verletzt (wie festgestellt), von dem Verletzten auf Rückruf von rechtswidrig hergestellten, verbreiteten oder zur rechtswidrigen Verbreitung bestimmten Vervielfältigungsstücken in Anspruch genommen werden.

Dieser Anspruch besteht nur, soweit der Verletzer tatsächliche oder rechtliche Möglichkeiten zur Einflussnahme hat. Rückruf bedeutet, dass der Verletzer an seine Abnehmer und Händler weiterer Handelsstufen herantritt und sie gegen Erstattung des Kaufpreises zur Rückgabe der rechtsverletzenden Werkexemplare auffordert. Ob der Rückruf Erfolg hat, liegt nicht in der Macht des Rückrufenden, der Erfolg des Rückrufs ist mithin nicht geschuldet (Dreier in Dreier/Schulze, UrhG, 4. Auflage 2013, § 98, Rn. 17). Die Antragsgegnerin kann sich nicht damit entlasten, sie habe das Eigentum an den ausgelieferten Büchern bereits an ihre Abnehmer übertragen. Auch wenn sie

keinen rechtlich durchsetzbaren Anspruch auf eine Rückgabe der Bücher hat, ist der Anspruch nicht auf etwas Unmögliches gerichtet. Der Antragsgegnerin bleibt es tatsächlich möglich, ihre Abnehmer unter Hinweis auf die gegenüber ihr titulierte Verpflichtung nachhaltig aufzufordern, die Bücher gegen Kostenerstattung zurück zu geben. Es ist keineswegs ausgeschlossen, dass damit zumindest ein Teil der rechtsverletzenden Werkexemplare zurückgerufen werden können, zumal die so Angesprochenen ihr eigenes Risiko bei einer Fortsetzung der Verbreitung zu berücksichtigen haben werden (s. a. Wandtke/Bullinger/Bohne, UrhR, 4. Auflage 2014, R 98, Rn. 38 – 39).

Die Antragsteller begehren mit ihrem Antrag nicht mehr, wie sich aus ihrem Schriftsatz vom 2. März 2015 ergibt. Insbesondere ist ihrem Vortrag nicht zu entnehmen, dass sie die Antragsgegnerin über ein aktives, ernsthaftes Bemühen um einen Rückruf auch zu dessen Erfolg verpflichten lassen wollen. Ein solcher Rückruf nimmt die Hauptsacheentscheidung nicht in unzulässiger Weise vorweg. Vielmehr bleibt es der Antragsgegnerin unbenommen, den Vertrieb der Bücher später gegebenenfalls wieder aufzunehmen. Die Geltendmachung des Rückrufsanspruchs ist nicht auf einen Hauptsacheprozess beschränkt. Das Gesetz sieht, anders als etwa bei der Differenzierung eines Auskunftsbegehrens nach § 100 Abs. 7 UrhG, keine Ausklammerung des Anspruchs aus § 98 Abs. 2 UrhG für das einstweilige Verfügungsverfahren vor. Unabhängig von § 98 Abs. 2 UrhG ist die Rückrufpflicht ohnehin ein Bestandteil der Unterlassungsverpflichtung, die sich nicht in einem bloßen Nichtstun erschöpft, sondern auch zur Beseitigung eines zuvor geschaffenen Zustandes verpflichtet (vgl. KG - 5 W 253/10 -, Beschluss vom 2. November 2010, zum UWG). Die Gewährung effektiven Rechtsschutzes gebietet daher die Anwendung des § 98 Abs. 2 UrhG auch im einstweiligen Rechtsschutz.

Es ist nicht erkennbar, dass die Verpflichtung zu einem solchen Rückruf unverhältnismäßig im Sinne des § 98 Abs. 4 UrhG wäre. Die Antragsgegnerin ist – wie bereits ausgeführt - nicht schuldlos in die Situation hineingeraten, sie ist vielmehr der agierende Part. Sie kann den Antragstellern nicht vorhalten, sie hätten den Schaden durch ein zögerliches Verhalten gefördert und wollten ihr schaden. Die Antragsgegnerin konnte bereits dem Schreiben vom 9. Januar 2015 entnehmen,

dass keine Einwilligung erteilt werden soll. Sie hat nicht dargetan, wann die erste Auflage des Buches gedruckt und gebunden war, ob also eine frühere Inanspruchnahme durch die Antragsteller überhaupt etwas anderes hätte bewirken können. Wäre ihr an einer früheren Klärung der Rechte und des Risikos mit den Antragstellern gelegen gewesen, hätte sie diese selbst vorher ansprechen können, anstatt sich auf eine Erklärung der Lizenzgeberin zu verlassen und es den Antragstellern zu überlassen, selbst die Veröffentlichung in Deutschland zu entdecken. Spätestens nach dem Schreiben vom 9. Januar 2015 hätte die Antragsgegnerin die Veröffentlichung oder zumindest die Auslieferung an den Handel vorübergehend aufschieben können, um die jetzt entstandene Lage zu verhindern, zumal ein tagesaktueller Bezug des Buches, der eine besondere Eile hätte rechtfertigen können, nicht zu erkennen ist.

Es besteht auch ein Verfügungsgrund im Sinne der §§ 935, 940 ZPO. Den Antragstellern ging es ursprünglich darum, die unmittelbar bevorstehende Veröffentlichung des Buches zu verhindern. Nunmehr wollen sie die Folgen der Veröffentlichung minimieren. Beide Begehren sind dringlich und nicht auf einen Prozess in der Hauptsache zu verweisen.

Ein dringlichkeitsschädliches Verhalten der Antragsteller ist nicht festzustellen. Im Kammergerichtsbezirk gilt grundsätzlich eine Dringlichkeitsfrist von zwei Monaten ab Kenntnis der für eine Antragstellung erforderlichen Umstände. Davon ist im Interesse der Rechtssicherheit allenfalls in besonders extremen Umständen des Einzelfalls abzuweichen (vgl. KG - 5 W 295/10 -, Beschluss vom 14. Dezember 2010). Ein solcher Ausnahmefall liegt hier nicht vor.

Die Antragsteller haben glaubhaft gemacht, selbst erstmals am 22. Dezember 2014 davon erfahren zu haben, dass die Antragsgegnerin das Buch zu veröffentlichen ankündigt. Die Antragsteller durften aus ihrer vorherigen Kommunikation mit dem amerikanischen Verlag davon ausgehen, dass dieser jedenfalls für Europa keine Lizenz verkauft hat und mussten den weltweiten Markt nicht aktiv beobachten. Die Dringlichkeitsfrist begann daher am 22. Dezember 2014 zu laufen. Es kann dahin stehen, ob die Kanzlei der heimischen Rechtsanwälte der Antragsteller diese

ZP 550

Kenntnisse bereits am 18. Dezember 2014 hatte und ob diese Kenntnisse den Antragstellern ohne Weiteres zuzurechnen ist, da ein Abstellen auf den 18. Dezember 2014 als Beginn der Dringlichkeitsfrist nichts änderte. Es besteht kein Grund, die Zweimonatsfrist ausnahmsweise zu verkürzen. Zugunsten der Antragsteller ist zu berücksichtigen, dass es sich um amerikanische Petenten handelt, die einen größeren Übersetzungs-, Prüfungs- und Abstimmungsaufwand haben als etwa ein deutscher Rechteinhaber. Der Trust hat zwar erst am 9. Januar 2015 eine Berechtigungsnachfrage gemacht, nach deren Beantwortung am 16. Januar 2015 die Antragsteller drei Wochen bis zur Abmahnung vergehen ließen. Die Antragsgegnerin musste aber bereits dem Schreiben vom 9. Januar 2015 entnehmen, dass von Seiten des Autors eine mangelnde Zustimmung gegen die Veröffentlichung des Buches geltend gemacht wird. Eine solche Prüfungs- und Abstimmungsfrist war den Antragstellern angesichts der komplexen Rechtsfragen auch in Ansehung einer bevorstehenden Buchveröffentlichung, die damals aber erst für den 9. März 2015 angekündigt war, zuzubilligen. Ab dem 9. Januar 2015 musste die Antragsgegnerin mit rechtlichen Schwierigkeiten rechnen und es war ihr eigenes Risiko, die Veröffentlichung unverändert fortzusetzen oder sogar noch zu forcieren. Der Antrag ist am 6. Februar 2015 und damit selbst bei einem Fristbeginn am 18. Dezember 2015 innerhalb der Zweimonatsfrist eingegangen, so dass die Dringlichkeit zu bejahen ist.

Die Kostenentscheidung beruht auf § 92 Abs. 1 S. 1 Fall 1 und S. 2 ZPO. Dabei war zu berücksichtigen, dass die Antragsteller die Herausgabe und den Vertrieb des Buches umfassend in drei Ländern verbieten oder rückgängig gemacht sehen wollten. Die Änderung des Teilantrags zu 1., die Veröffentlichung zu untersagen, in den neuen Antrag zu 2., die Veröffentlichung zu beseitigen, hat die Verfahrensbevollmächtigte der Antragsteller im Verhandlungstermin damit begründet, es solle über einen Rückruf aus dem Buchhandel hinaus erreicht werden, die Bücher überall dort, wo sie sich mittlerweile befinden, zurück zu holen, was als ein Minus zur Unterlassung der Veröffentlichung anzusehen sei. Die Antragsteller haben ihre Anträge wegen der Veröffentlichung bzw. deren Beseitigung insgesamt zurück genommen. Dasselbe gilt für das Verbot des Werbens, auch wenn diesem nach Ansicht des Gerichts im Verhältnis zu den eigentlichen

Verwertungshandlungen nur ein verhältnismäßig geringes Gewicht beizumessen war. Die Antragsteller haben ferner ihre Anträge zurück genommen, soweit sie auf die Länder Österreich und Schweiz bezogen waren. Schließlich haben sie ihren Antrag zu 3. (ursprünglicher Antrag zu 2.) hinsichtlich der Downloadangebote zurückgenommen. Diesem Antrag haben die Antragsteller zwar ein über das bloße Unterlassen hinaus gehendes Interesse beigemessen. Dieses Interesse ist nach Ansicht der Kammer jedoch in faktischer Hinsicht gering zu bewerten, da das Ziel bereits mit einer Unterlassungsverpflichtung im Wesentlichen zu erreichen ist. Berücksichtigt man mangels anderer greifbarer Grundlage die Bevölkerungszahlen der drei betroffenen Länder (Deutschland gut 80 Mio., Österreich und Schweiz jeweils gut 8 Mio.) und überträgt dieses Verhältnis auf den Umfang potentieller Nachfrage und geht man ferner davon aus, dass die Antragsteller für den maßgeblichen Zeitpunkt der Entscheidung mit den tenorierten Unterlassungs- und Rückrufpflichten in Deutschland ihre Ziele in wesentlichen Teilen erreicht haben, so halten sich die jeweiligen Obsiegens- und Unterliegensanteile insgesamt die Waage. Die Kosten waren daher gegeneinander aufzuheben.

Hinsichtlich der Unterlassungsverpflichtung waren antragsgemäß die gesetzlichen Ordnungsmittel nach § 890 Abs. 1 ZPO anzudrohen. Die Zwangsvollstreckung der Rückrufverpflichtung richtet sich nach § 888 Abs. 1 ZPO, eine Androhung der Zwangsmittel findet nicht statt, § 888 Abs. 2 ZPO.

Die nicht nachgelassenen Schriftsätze der Antragsgegnerin vom 12. und 23. März 2015 gaben keinen Grund zu weiterer Veranlassung, sie konzentrieren sich auf Rechtsfragen und enthalten keinen entscheidungsrelevanten neuen Sachvortrag.

Meyer-Schäfer                          Schaber                          Raddatz

ZP 550

Ausgefertigt
Berlin, 07.04.2015

Hirsch
Justizbeschäftigte