# EXHIBIT 2-T



**TRANSPERFECT**

City of New York, State of New York, County of New York

I, Alitasha Younger, hereby affirm that the following is to the best of my knowledge and belief, a true and accurate translation from Italian to English of the document "Warner Bros. Entertainment Italia s.p.a. et al. v. Passworld s.r.l. et al. (Feb. 6, 2013)".

Alitasha Younger
TransPerfect Translations International, Inc.

Sworn to before me this
May 21, 2015

Signature, Notary Public

AMY LEONG
Notary Public - State of New York
No. 01LE6314554
Qualified in Richmond County
Commission Expires Nov 10, 2018

Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS

THREE PARK AVENUE, 39TH FLOOR, NEW YORK, NY 10016 I T 212.689.5555 I F 212.689.1059 I WWW.TRANSPERFECT.COM

OFFICES IN 90 CITIES WORLDWIDE

ITALIAN PROCEEDINGS                                    **1570**

**1571**   COURT OF MILAN - Specialized Business Section - February 6, 2013 - *Presiding Judge*
TAVASSI - Warner Bros. Entertainment Italia s.p.a., Warner Bros. Entertainment Inc., Turner
Entertainment Co. (Attorneys Mondini, Carabelli) v. Passworld s.r.l., Unipersonale (Attorneys De
Sanctis, Collovà, Defrancesco, Hoesch. Pasquali), Mondo Home Entertainment s.p.a. now
Moviemax Media Group s.p.a. (Attorneys Vaghi, Frontello), SIAE - Società Italiana degli Autori
e degli Editori [Italian Society of Authors and Editors] (Attorney Paleologo), Cult Media s.r.l.
(Attorney D'Angelo), Cine Video Corporation s.r.l. (Attorneys Beccaris, Giussani), Reel Media
International.

*The possession of copyright under Art. 167 of the Copyright Law is manifested in a situation of*
*clear and established prior exploitation of rights, exercised through actual power over the works and*
*expressed in the exploitation and use of the same, with financial and economic benefits and, externally, in*
*the general recognition of such ownership by third parties (1).*
　　*A film obtained through colorization may be subject to independent copyright protection when*
*the colorization method used requires the selection of colors according to human taste and*
*craftsmanship, completed through discretionary selection from among a broad series of colors, shades,*
*and combinations, such that the final result is a product that substantially changes the appearance of the*
*film to the viewer; more so when the colorizing is for an animated film with imaginary characters, which,*
*as such, may be freely characterized through color as well, being free of precise correspondence*

http://www.iusexplorer.it/iusexplorer/PrintExportSend

**1571**        AIDA [Annali italiani del diritto d'autore (Italian Copyright Annals)] 2013

*to pre-existing reality. It follows that the colorist must be considered a co-author of the new work, which factors into the determination of the duration of its protection (2).*

*The Italy/USA convention of 1892 is still in effect, establishing the full assimilation of American works to Italian works (and vice versa), and that the duration of the American film in Italy must be calculated based on Italian regulations under Art. 32 of the Copyright Law, and is exempted from Art. 20 of the Berne Convention and Art. XIX of the Paris Universal Convention (3).*

*If a work falls into the public domain in its country of origin for the sole reason that the renewal formalities under national law, in effect at the time and now abolished, were never completed, but, in the absence of compliance with these formalities, the work is still protected since the protection terms specified under subsequent national regulations have not expired, then the work is not considered to have fallen into the public domain under Art. 18.4 of the Berne Convention (4).*

*Negligence is insufficient for the application of the rules on acts of piracy under Art. 144 c.p.i. [Codice della proprietà industriale (Industrial Property Code)] (5).*

(Omitted) REASONS FOR JUDGMENT IN FACT AND IN LAW - 1. With the writ of summons of September 4, 2008, Turner Entertainment & Co. ("Turner"), Warner Bros. Entertainment Italia s.p.a. ("WB Italia"), and Warner Bros Entertainment Inc. ("WB") brought suit against Password s.r.l. ("Password") , Mondo Home Entertainment s.p.a. ("MHE," now Moviemax Media Group s.p.a.), accusing them of violating the plaintiffs' exclusive rights to economic exploitation for numerous cartoons from the "Looney Tunes" and "Merry Melodies" series, consisting of their illegal duplication on DVD and/or VHS, with improper modifications, and their subsequent distribution and marketing.

The plaintiffs therefore asked the Court, upon ascertainment of the illegality of the conduct of the defendants, both under the law on copyright and on unfair competition, to sentence Password and MHE to restitution of the illegal proceeds from the duplication, distribution, and marketing of the media in question, as well as reimbursement for damages caused to the plaintiffs, including damage to their image and reputation; the destruction of the media in question; and the injunction against defendants Password and MHE from any further use of the cinematographic works in dispute, as well as ancillary rulings. The plaintiffs also submitted a petition against S.I.A.E - Società Italiana degli Autori e degli Editori ("SIAE") for an injunction against the issuance of endorsement stamps for any media reproducing the animated films in dispute.

1.1 The defendants, following their appearance in court, requested the substantial rejection of the plaintiffs' petition.

Upon petition of the defendants, MHE also sued the American company Real Media International (summoned by Password and declared to be in default due to failure to appear) and the Italian companies Cult Media s.r.l. and Cine Video Corporation s.r.l. (summoned by MHE).

In particular, the non-completion of the summons against Reel Media led to a series of postponements of the hearing until November 22, 2011, at which time the default of the same was declared.

2. The subject of this dispute is constituted by several animated films

© Copyright Giuffrè 2015. All rights reserved. VAT No. 00829840156

ITALIAN PROCEEDINGS                                                    **1571**

whose protagonists are famous cartoon characters (and their related trademarks, logos, and musical themes) of the "Looney Tunes" and "Merrie Melodies" series (i.e., Bugs Bunny, Tweety, Daffy Duck, etc. [...], - hereinafter "Characters"; for a detailed list see pages 8 et seq. of the writ of summons) owned by WB and Turner, whose rights to exclusive exploitation in Italy belong to WB Italia (for a detailed breakdown of titles owned by Warner and Turner, see pages 12 et seq. of the plaintiffs' closing statement and herein). These consist of some films originally produced in black and white, which were subsequently made into colorized versions through a manual colorization procedure ("Warner Cartoons"), and some films directly produced in color ("Turner Cartoons"). These films also have Italian versions, duplicated after the adaptation of the original dialogues in English. The plaintiffs states that these cartoons from the "Merry Melodies" and "Looney Tunes" series, accompanied by the logo (represented by the first and last initials) and musical theme were used uninterruptedly and continuously in movies, on television, and in reproductions on videocassette and DVD, so much as to have created in the public a strong association between the film characters and the films themselves, ensuring protection not only to the cartoons considered as a whole, but also to the individual characters, logos, and initials.

In particular, the effigies of the Characters were registered as trademarks (doc. 4, plaintiffs), as well as Warner's "WB" emblem, set on a shield, and the name "Looney Tunes," combined with the logo made up of a series of concentric circles and a drawing of the head of the Bugs Bunny character, which also enjoyed typical industrial protection. All registered trademarks, both in Italy and abroad, were, over time, transferred to WB, which currently has total ownership (more precisely, Warner Bros. Inc., assignor of WB had registered the images of the Characters as company trademarks, and such trademarks are now the property of WB, both in Europe and in the rest of the world, see doc. 4, plaintiffs' file).

The chain of title on the aforementioned intangible assets, as represented and documented by the plaintiffs, legitimizes the present legal action taken by them. The plaintiffs' reconstruction on this point can be summarized as follows: the animated cartoons in dispute were produced in the United States by The Vitaphone Corporation, a subsidiary of Warner Bros. Pictures Inc., with the exception of the Doggone Tired cartoon, which was produced by Metro Goldwin Mayer – MGM, and the versions colorized from the original black and white were produced and published by Warner Bros. – Seven Arts Inc. After the purchase of the rights by WB, it transferred part of its catalog, excluding Doggone Tired, to PMR (docs. 100-101, plaintiffs' file), which then transferred them to United Artists Associated Inc. United Artists Associated Inc., which had then become United Artists Corporation, transferred its assets and the right to the economic utilization of the animated films to United Artists Holding Company (doc. 105, plaintiffs); the latter then transferred them to MGM/United Artists Entertainment Co., which became MGM Entertainment Co. MGM was merged by incorporation into TBS Entertainment Co., which already owned Doggone Tired (for more details, see pages 28 et seq. of the plaintiffs' closing arguments). Warner produced a photocopy of the documentation of the chain of title and subsequent transfers with the writ of summons, with sworn translation, while the authenticated copy was placed in the files with the brief under Art. 183 VI, paragraph no. 2 c.p.c. [Codice di Procedura Civile (Code of Civil Procedure)].

2.1 The commercial initiative under which all the disputed conduct of the defendants took place was the publication and distribution and marketing

*903*

© Copyright Giuffrè 2015. All rights reserved. VAT No. 00829840156

**1571**        AIDA [Annali italiani del diritto d'autore (Italian Copyright Annals)] 2013

of the "Cartoon Show" line, dedicated entirely to Warner's most famous characters, and therefore their most famous cartoons (such as Daffy Duck, Bugs Bunny, and others) on VHS and/or DVD (docs. 24-29, Warner, and pages 9 et seq. of the plaintiffs' closing argument), in some cases also modified and/or cut in some parts (e.g., elimination and/or substitution of the emblem and trademarks at the beginning and end of the original works) and the consequential use of the plaintiffs' trademarks and emblems in the absence of any authorization for such use.

In relation to the current status of the rights claimed, although these are not recently-created works, the plaintiffs maintained that, in light of regulations and significant national and international agreements, the counterparty's theory of the free usability of the works in question due to their having fallen into the public domain could in no case be true, especially in consideration of the fact that some of the authors of the works are still living (or, in any case, passed away quite recently).

The plaintiffs therefore asked, on the one hand, for the sentencing of Passrowrd and MHE (hereinafter "Moviemax") to the restitution of proceeds from the duplication of media, the reimbursement of related damages, including to their image, the destruction of the media, and an injunction against any further use of the films; and, on the other hand, an injunction against the defendant SIAE from the future issuance of endorsement stamps for any media reproducing "Merry Melodies" and "Looney Tunes" animated films.

3. From the first communications and notices prior to the proceedings, Passrowrd's principal argument (which also substantially aligns with the argument of the other defendants/third parties summoned) consisted in maintaining the conviction that the works in question were freely useable since they had already fallen into public domain.

In particular, according to defendant Passrowrd's theory, the animated films in question had fallen into public domain due to failure to comply in the United States with the formalities of copyright renewal prescribed by US legislation at the time (i.e., the Copyright Act of 1909), which required that the term of protection of rights to the economic exploitation of cinematographic works was 28 years, extendable for another 28 years upon request ("renewal after registration"), which did not occur in this case. In these circumstances, the rights allegedly held by the plaintiffs had—according to the defense's argument—expired over time, and were not protected nor protectable, in Italy or in other countries party to the Berne Convention, as they had fallen into the public domain in the country of origin (i.e., the USA) well before the USA had signed onto this Convention (which in fact happened only in 1989), in compliance with the provisions of Art. 18 of the same Convention.

This legal reconstruction was also—according to Passrowrd—endorsed by its assignor, Reel Media International (summoned but in default; hereinafter "Reel") which, exclusively conceding to Passrowrd the filmic materials related to the works in dispute (contract under doc. 1), had assured them that they should be considered to be in the public domain in the USA. This assumption was also confirmed by other sources, such as the "Film Superlist: Motion Pictures in the US Public Domain" volumes, and from research carried out at the Copyright Office (see docs. 2 et. seq. submitted by Passrowrd).

3.1 With regard to the position of MHE, which objected in particular to the charge of violation of distribution rights belonging to the plaintiffs under Art. 13 of the Copyright Law, and criminal wrongdoing under Art. 171 ter, letter c.) of the Copyright Law, as well as violation of the rights

*904*

© Copyright Giuffrè 2015. All rights reserved. VAT No. 00829840156

ITALIAN PROCEEDINGS **1571**

to create the derivative works in question under Art. 18 of the Copyright Law, rights to trademarks, and conspiratorial wrongdoing under Art. 2598 c.c. [Codice Civile (Civil Code)], as well as the offenses under Arts. 473 and 517 c.p. [Codice Penale (Penal Code)], the argument of the same, in fully contesting the claims and petitions submitted against the counterparty, counter-argued as follows.

First of all, it noted its good faith, maintaining that it had always and only executed the mandates for distribution authorizing the marketing of the films in question that provided guarantees from their assignors of the legality of the distribution (see the contracts submitted under docs 3 and 4, as well as docs. 6 et seq.), because of, among other things, the assurance that these works were in the public domain. In further support of its theory of good faith, MHE noted that media delivered to it by its assignors (again attributable to Password) were affixed with the proper SIAE markings.

In any case, MHE, as a precautionary measure, stated that it had temporarily suspended the sale of the contested products.

On the merits of the matter, MHE refuted the plaintiffs' theories, noting among other things that the rights allegedly damaged (reproduction and marketing, not cinematographic exploitation) were subject to the regulations and terms under Art. 78 ter of the Copyright Law, which specifies a protection period of 50 years from the first communication or publication of the work (not 70 years after the death of the author under Arts. 44 and 32 of the Copyright Law) and that the works on which these proceedings must substantially be based were the "original" ones and not the subsequent works that had undergone colorization, with all the resultant consequences in terms of duration of protection

4. Finally, with regard to the positions of the third parties summoned, Cine Video Corporation (hereinafter CVC) and Cult Media, their arguments can be summarized as follows.

Both refer to having entered into a contract with Password (doc. 3 for CVC and doc. 1 for Cult Media), through which the latter conferred, to CVC and to Cult Media, the task of selling the video recordings of the films in question, though creating the videotapes at their own care and expense and then sending them to CVC, with Password assuming the obligation to release and hold harmless the latter for any possible claims on copyright under the contract between the parties. In particular, CVC also noted that it had stopped its distribution activity in 2005, when, believing itself to be the legal holder of the distribution rights for the films in question through the aforementioned contract, it entrusted the sale of its products to MHE, clarifying that before these proceedings it never questioned the legality of the distribution due to the existence of contestations of the rights of such works.

CVC and Cult Media therefore asked to be released by Password and (CVC only) for compensation for damages.

5. The Panel Court met in chambers on November 8, 2012, and noted the following.

First, we must analyze the prejudicial objections regarding the standing of the parties in the lawsuit.

With regard to the plaintiffs WB, WB Italia, and Turner, the panel of judges holds that the documentation they submitted to the court (including the authenticated copies of the documents previously attached as photocopies, excerpts from the periodical "Motion Picture Herald" and from the volume *Looney Tunes and Merrie Melodies: A Complete Illustrated Guide to the Warner Bros. Cartoons*, and copies of the initial frames of the works, as well as the other documents later submitted during the proceedings) confirm the succession of the chain of title

*905*

© Copyright Giuffrè 2015. All rights reserved. VAT No. 00829840156

**1571**        AIDA [Annali italiani del diritto d'autore (Italian Copyright Annals)] 2013

as reconstructed by the same and by which they have therefore given suitable and sufficient proof of their ownership with regard to their legal positions and the rights that in these proceedings are assumed to be damaged by the other parties, with reference both to the Warner Cartoons and the Turner Cartoons.

Indeed, on this topic, the Panel Court shares—as previously stated in similar cases—the consolidated jurisprudential orientation, appropriately cited by the plaintiffs, according to which "it is only in the conflict between claims of ownership of the right itself that the document is necessary to decide on the case, and, vice versa, the acquisition of rights to exploitation can also be proven by means other than a document, in cases where the right is invoked by those who have been harmed by the third party who, without having anything similar, exploited the same asset" (Court of Cassation 3/7/2003, no. 3390 in Giur.It., 2003, 1857; in the same sense: Court of Cassation 10/19/1963, no. 2780, in Mass., 1963, 951; Court of Cassation 02/11/1994 no. 1392, in Mass., 1994, 98 and in Dir. Autore, 1994, 602; Court of Cassation 04/27/1998 no. 4273, in Mass. 1998, 446, and in Giust. Civ., 1998, 2565; Court of Cassation 12/13/1999, no. 13937, in Mass. 1999, 1363).

5.1 Equally, the plaintiffs' claim regarding the principle of presumption of ownership of rights is material and well-founded, and internally substantiated by possession of the same (Art. 167 of the Copyright Law); such possession consists in a situation of prior, notorious, and concrete exploitation of rights, exercised through actual power over the works, and is manifested in the exploitation and use of the same with economic and financial benefit, and externally substantiated in the general recognition of such ownership by third parties.

5.2 Furthermore, the objections and findings of the defendants on the circumstances, for which the defendants have provided documentation for the chain of title through the submission of simple photocopies (not even the originals) have no value (some of them are actually improper and tardy, formulated only in the closing arguments). And, in truth, the objection with regard to the lack of correspondence of the photocopies in the records to the originals is not properly formulated according to the provisions of Art. 2719 c.c. and Art. 215 c.p.c., in light of its interpretation in jurisprudence, which we must share in this instance as well.

Indeed, the unauthenticated photocopy is accepted if the party does not disavow it at the first hearing, thus burdening the party who presents the allegation regarding the original, notwithstanding the ability of the judge to ascertain compliance in some other way (Court of Cassation, section III, no. 4476/09). This disavowal, moreover, cannot be general, but must be directed toward the document and what is contested within it (Court of Cassation, section II, no. 28096/09). In particular, Court of Cassation order no. 5461 of 03/14/2006 affirmed that, on the topic of documentary proof, the burden of disavowing conformity between the original of a document and the copy of it produced in the proceedings, though not necessarily implying the use of ritualized formulas, is resolved through a statement of clear and specific content: that is, such that the details of the denial of the genuineness of the copy can be deduced unequivocally. It follows that the unauthenticated photocopy of a document is accepted as conforming to the original under Art. 215, no. 2 c.p.c., if the appearing party against whom it was submitted does not formally and specifically disavow it at the first hearing or in the first reply after its submission.

It can again be noted, with reference to the case at hand, that general or all-inclusive objections cannot therefore be deemed sufficient for purposes of reevaluating the evidentiary efficacy of the copy (Court of Cassation order no. 30082 of 12/12/2011 to 12/29/2011), such as

*906*

© Copyright Giuffrè 2015. All rights reserved. VAT No. 00829840156

02/12/2015 19:34

http://www.iusexplorer.it/iusexplorer/PrintExportSend

those particularly aimed at defendant Passworld in the entry of appearance and in subsequent records. The more detailed discussion in the third Passworld brief on the repeated subject of the non-correspondence to the originals is therefore tardy (on this point, we share the statement of the investigator in the order of March 16, 2012).

5.3. Moreover, on this point, it also seems relevant to this Panel Court that the finding of the plaintiffs under Art. 110 of the law on copyright requires the written documentation of transmission of copyright uniquely for purposes of evidence and not ad substantiam (Court of Cassation, March 7, 2003, no. 3390 in Giu. It., 2003, 1857), as well as the pertinent maxim cited by the plaintiffs in their argument documents, according to which "the transfer of copyright from one subject to another in the United States can be proven in the Italian courts with the submission of the related foreign private agreement, without the need for it to be authenticated. When the transferee of counterfeit copyright has proven its purchase with the submission of the related document...it is incumbent on the defendant who contests the actor's purchase to provide the proof of its objections" (Court of Cassation, November 12, 1994, no. 9529, in Aida 1995, pp. 382 and 383 and Court of Cassation, May 21, 1998, no. 5072 in Riv. Dir. Ind., 1999, II, 432).

Given the above, the Panel Court deems that it cannot therefore proceed further in the investigations with regard to the objection in question.

5.4 With regard to MHE and Cult Media, each of which has raised the objection of their lack of standing to be sued regarding the petitions submitted against them by the plaintiffs, the Panel Court notes that lack of standing to be sued requires verification of the formal propriety of the case according to the plaintiffs' arguments; from the examination of the arguments and questions submitted by the plaintiffs' argument, the standing of the indicated defendants appears to exist, while the actual obligation of the legal relationship in dispute has to do with the merit of the dispute (on the relationships between the defendants with regard to the network of releases and guarantees see below, among many others: Court of Cassation, 3/6/2008 no. 6132 in Mass. Giur. It. 2008; Court of Cassation 2/6/2004 no. 2326 in Arch. civ. 2004, 1480) and will be examined below.

5.5 Finally, with reference to the position of SIAE, the Panel Court finds, as stated by the plaintiffs in the writ of summons and as explained subsequently, up to the closing argument, "acknowledging the initiatives taken by the organization (which recently, as a result of the ascertainment carried out, refused to issue to Passworld the marks for the marketing of media), we observe that SIAE's participation in these proceedings will make it so that the sentence rendered also refers to the latter, endorsing the position taken against Passworld and thus removing it from any complaint and any claim by the same" (page 72, plaintiffs' final appearance).

6. Thus, having clarified the prejudicial/preliminary questions, we may now address the merit of the case.

The first legal problem to be resolved has to do with the analysis and interpretation regarding the regulations and rules applicable to the filmic works in question, in order to establish whether they have fallen into public domain, and therefore whether they are freely useable by third parties.

6.1 We must first start by stating the total assimilability of animated films (animated cartoons) to cinematographic works in the strict sense, under Art. 2 no. 6 of the Copyright Law.

Before entering into the network of national regulations and international accords applicable in this case, we must also clarify that the analysis that follows will take into consideration, with regard to the Turner Cartoons (i.e. Daffy Duck and the Dinosaur,

*907*

© Copyright Giuffrè 2015. All rights reserved. VAT No. 00829840156

**1571**      AIDA [Annali italiani del diritto d'autore (Italian Copyright Annals)] 2013

published in color in 1939, death of last co-author 2003, doc. 64; Yankee Doodle Daffy, published in color in 1943, death of last co-author 1995, doc. 36; Daffy The Commando, published in color in 1943, death of last co-author 1995, doc. 36; Doggone Tired, published in color in 1949, death of last co-author 1980, doc. 39; Inky and the Minah Bird, published in color in 1943, death of last co-author 2002, doc. 63; Corny Concerto, published in color in 1943, death of last co-author 1984, doc. 47; Wakiki Wabbit, published in color in 1943, death of last co-author 2002, doc. 63; The Wabbit Who Came to Supper, published in color in 1942, death of last co-author 1995, doc. 36; The Case of the Missing Hare, published in color in 1942, death of last co-author 2002, doc. 63; Fresh Hare, published in color in 1942, death of last co-author 1995, doc. 36; The Wacky Wabbit, published in color in 1942, death of last co-author 1984, doc. 47; Prest'o Change'o, published in color in 1939, death of last co-author 2002, doc. 63; Pigs in a Polka, published in color in 1943, death of last co-author 1995, doc. 36; Foney Fables, published in color in 1942, death of last co-author 1995, doc. 36; I Wanna Be a Sailor, published in color in 1937, death of last co-author 1980, doc. 39; Ding Dog Daddy, published in color in 1942, death of last co-author 1995, doc. 36; Crowing Pains, published in color in 1947, death of last co-author 1977, doc. 94; A Tale of the Two Kitties, published in color in 1942, death of last co-author 1984, doc. 47; Failing Hare, published in color in 1943, death of last co-author 1984, doc. 68: To Duck or Not to Duck, published in color in 1943, death of last co-author 2002, doc. 63), the original versions, direct objects of the ascribed illegal use, originally produced in color; and, with regard to the Warner Cartoons (The Impatient Patient, Porky's Bear Facts, Porky's Garden, Daffy's Southern Exposure, The Daffy Duckaroo. The Henpecked Duck, A Coy Decoy, Porky Pig's Feat, Ali Baba Bound, Timid Toredor, Notes To You; cf. docs. 30 et seq., plaintiffs), originally produced in black and white, the colorized versions produced by Warner Bros – Seven Arts Inc. in 1968 (in particular, by Fred Ladd, see docs. 121 and 121 bis of the plaintiffs' file).

6.2 With respect to the Warner Cartoons, in fact, the Panel Court accepts and shares the argument of the plaintiffs to consider the "colorized" works as independent works with respect to the black and white originals, with the effect of conferring on them the protection specified by copyright, with the consequent expiration of the term set by Art. 2, paragraph VI of the Copyright Act, starting from the death of the last surviving co-author (which in this case should also include the colorists).

The activity of colorization, in fact, far from being a mere mechanical and banal activity, is actually a true artistic (re)elaboration in itself, characterized by creative and personal decisions and choices, dictated by the artistic sensibility of the "colorist."

He or she must, in fact, distinguish between typically creative colorization (more correctly, colorization techniques) and low-quality, banal colorization: when the colorization method used requires the selection of colors according to human taste and craftsmanship, and is carried out through the discretionary choice from among a broad series of colors, shades, and combinations, such that the final result is represented by a product that substantially changes the appearance of the film to the viewer (the plaintiffs correctly spoke of the "clear change of technical-expressive language of the original work"), the —new and different—film obtained after the colorization procedure can and must be considered subject to independent copyright protection (both in Italy under Art. 4 of the Copyright Law, and in the USA where it is registered at the Copyright Office).

Due to the methods, combinations, and techniques used in this case (see

© Copyright Giuffrè 2015. All rights reserved. VAT No. 00829840156

clarifications in the affidavit of Fred Ladd, docs. 121 and 121 bis, plaintiffs' file, non-specifically contested in this regard, and also observed by viewing the cartoons in question), considering the particular type of work on which they were done, and the techniques that were actually available at the time, we must certainly conclude that the colorization was artistic and creative, as soon as the colorization procedure used (completely by hand) undoubtedly involved and allowed the human worker the artistic choice of colors for every character and scene, as well as the material execution of the coloring in individual details. This can especially be seen in the case of cartoon characters, since they are so freely characterizable, including in colors, being unbound by the relationship of precise correspondence with pre-existing reality.

6.3 As a necessary corollary to the above, it also follows that the colorist, for his/her artistic contribution, can and must be considered a co-author of the work. With his or her creative contribution described as above, it can be deemed that the same participates in those characteristics, both in terms of expressive autonomy and contribution to the total constitution of the work, of the figures specifically indicated by Art. 44 of the Copyright Law, with jurisprudence and the most authoritative doctrine deeming that the list under Art. 44 (and therefore Art. 32) does not preclude the possibility of also considering authors of a cinematographic work subjects other than those expressly mentioned.

With regard to the objections of the Passworld argument with regard to Fred Ladd's failure to sign the list attached to the affidavit (see doc. 121 bis), we can say that the text of the statement (see translation page 1, lines 11 to 13) refers directly to the list under the same attachment "A"; also, comparing this list with the list under the writ of summons from the plaintiffs (pages 9 to 24 of the writ of summons and the plaintiffs' concluding arguments, page 12 et seq. to page 28) with the documents indicated in support of the individual Cartoons, we derive confirmation of the veracity of the list in the indicated affidavit (with this list including all the titles in dispute as well as titles other than those in dispute).

That said, it is hardly necessary to note that the copyright in question (therefore both with reference to the Warner Cartoons, and, even more so, with reference to the Turner Cartoons, for which the references were made with regard to the life of the co-authors indicated in Art. 44 of the Copyright Law) is the "primary" one under Arts. 32, 45, and 46 of the Copyright Law (which grant the producer protection of the works for the duration of 70 years, starting from January 1 of the year after the death of the last surviving co-author of the work with reference to any right of financial utilization of the cinematographic work) and not the copyright on the related rights under Art. 78 ter of the Copyright Law (which instead specifies the lesser protection of 50 years from the fixation, communication, or publication of the work).

6.4 Having therefore arrived at the investigation with regard to the regulatory landscape in which the issues at hand must be immersed, for the purpose of assessing whether the works in question were to be considered to have fallen into the public domain (or if they still—and for which countries—enjoy protection), we must first consider: the bilateral agreement ("exchange of notes") between Italy and the USA in 1892 (and subsequent amendments), still in effect, which requires the full assimilation, for the purposes of their protection, of American works to Italian works; the Berne Convention, in effect between Italy and the United States as of March 1, 1989 (the date when the United States signed the agreement), which requires that foreign works be granted the same protection specified by Italian law for

*909*

© Copyright Giuffrè 2015. All rights reserved. VAT No. 00829840156

**1571**        AIDA [Annali italiani del diritto d'autore (Italian Copyright Annals)] 2013

Italian works and vice versa; the Copyright Law, in particular Arts. 32, 13, 17, 45, and 46 of the Copyright Law (with related amendments established by EU regulations and, specifically, Directive 93/98), which require that cinematographic works be protected in Italy for 70 years starting from January 1 of the year after the death of the last surviving co-author of the work, and that the rights of reproduction and distribution are exclusively granted to the producer of the work and its assignees.

And, in fact, it is actually the Italy/USA Convention of 1892, although this is clearly an older document, to which we must give our greatest attention. In fact, this bilateral treaty, never formally abrogated and which must be considered still valid (see Art. 20 of the Berne Convention and Art. XIX of the Universal Copyright Convention adopted in Paris on July 24, 1971; see documents I, J, K of the plaintiffs, and in particular, document J, Official Gazette of 9/17/1948, year 89, no. 217, containing the Foreign Ministry Communication on the efficacy of bilateral treaties entered into by Italy prior to the world war, which includes the "exchange of notes related to copyright" with the United States of America), which established (and still establishes) the full assimilation of United States works to Italian works and vice versa, without exception or comparison of terms of protection specified by the respective domestic legislation, with the consequence that the duration must be calculated based on Italian regulations and, therefore, with reference to Art. 32 of the Copyright Act (that is, the seventieth year after the death of the last surviving co-author). This bilateral treaty supersedes the Berne Convention (see Art. 20) in that it confers to the authors more extensive copyrights than those granted by the Convention and not in conflict with the Convention itself. Similarly, Art. XIX of the Universal Convention of Paris does not affect the bilateral conventions in effect between the two states, specifying that, in case of divergence, the provisions of the Convention shall prevail.

With reference to the communication of the Ministry of Foreign Affairs of 3/12/1980, referenced by the Passworld argument, we must be aware that the reading of Art. IV of the Universal Convention of Paris and Art. XIX cannot disregard the reading also of Art. XVII, which establishes that the same Convention "does not prejudice in any way the provisions of the Berne Convention."

6.5 With regard to the analysis of the Berne Convention, to be considered therefore incorporative—for the countries in question—of the Universal Convention of Paris, the former states, under Art. 5 that "the enjoyment and exercise of these rights shall not be subject to any formality and shall be independent of the existence of protection in the work's country of origin. Consequently, [...], the extent of protection and the means of redress afforded to the author to protect his rights shall be governed exclusively by the laws of the country where protection is claimed."

In the opinion of the Panel Court, the formulation of the cited article is interpreted coherently with respect to its rationale in the reading given to it by the plaintiffs' argument.

This argument in particular argued substantially that, in light of the provisions of Art. 5, col. 1 and 2 of the Berne Convention, copyright protection is not bound by compliance with the particular formalities or the existence or not of protection in the work's country of origin, with importance only being given to the legislation in the country in which the protection is requested. Therefore, stating that, with respect to the inspiring rationale of the principles set out in the Berne Convention, falling into the public domain in the country of origin of the work due to the failure to comply with mere formalities (as in this case) cannot represent an obstacle to the application of protection under the Convention (all the more so now that American regulations have increased the term of protection for the rights in question to 95 years after the death of the author). In other words:

*910*

© Copyright Giuffrè 2015. All rights reserved. VAT No. 00829840156

if in the country of origin a work has actually fallen into the public domain due only to the fact that the formalities of renewal required by current national law at the time and then abolished were not fulfilled, such that, in the lack of such formality (and of such noncompliance) the work would still be susceptible to having protection, with the term of protection (subsequently) specified by national regulations not having expired, the work would not fall into the public domain under the Berne Convention, and thus by virtue of the salvation clause under Art. 18 point four (this theme has been thoroughly discussed by the plaintiffs' argument on pages 48 et seq. in the plaintiffs' closing argument and in the copious references to doctrine and jurisprudence cited in its support). The question is therefore reduced to the simple reply to the question of whether the works have fallen into public domain due to the failure to comply with some formality (at the time of publication and/or for subsequent noncompliance with a formality of registration necessary to continue its protection until the expiration of its cumulative terms - 56 years) , that is, because the total term specified by current law (56 years) has expired: in the first case (i.e., the work has fallen into public domain due to lack of compliance with a mere formality), the duration established in the work's country of origin should be identified with the term that would have been applicable when such formality was complied with (or if there were no such formality) and therefore solidly within the term of 56 years.

The Panel Court, though considering such reasoning undoubtedly complex—as well as, in some ways, unheard of—nonetheless deems it worthy of acceptance and sharing. Conversely, the argument articulated by the defendants (and in particular by Passworld) on the point would appear perhaps pertinent before a United States Court, but is irrelevant to our context.

From the analysis of Art. 18 of the Convention, and from an interpretation that is literal and adheres to the text, it in fact seems to show that the limit to the principle of retroactivity sanctioned by paragraph one, determined by the falling into public domain of the work in its country of origin ("the [...] Convention applies to all works that, at the moment of its entry into force, have not fallen into the public domain in their country of origin due to the expiration of the duration of protection"), effectively intends to indicate as a resolving element of evaluation "the expiration of the duration of protection" in the country of origin, and not the failure to comply with a formality in the country of origin as a result of which the work falls into the public domain, unlike the regulatory provision, which merely says "did not fall into public domain in their country of origin" and did not add the reference to the cause of such supposed falling into public domain with the expression "due to the expiry of the term of protection."

This reasoning, to make a concrete example, therefore leads to the following conclusion: we consider the application to the Turner works published in 1937 (which, as noted here, are the oldest) of the then-current regulations (i.e., the Copyright Act of 1909, which governed the material until January 1, 1978; subsequently the Copyright Act of 1976, in effect since 1978, provided that works already fallen into public domain did not have the benefit of any automatic extension of rights, because there is no possibility of automatic renewal, with the principle of automatic renewal introduced only with the Copyrights Amendment act of 1992, with the automatic renewal of protection for works published or registered between January 1, 1964 and December 31, 1977). For the purposes of the Copyright Act of 1909, works published with copyright notice

*911*

© Copyright Giuffrè 2015. All rights reserved. VAT No. 00829840156

**1571**        AIDA [Annali italiani del diritto d'autore (Italian Copyright Annals)] 2013

and/or registered at the Copyright Office enjoy 28 years of protection, renewable for another 28 with the appropriate renewal registration, thus assuring protection for 56 years (28 + 28, ignoring the constitutive formality for the second "block" of protection for the further duration of 28 years, for the reasons given above – prohibition of formalities under Art. 5 of the Berne Convention), starting from the earliest date of the first publication of the work with copyright notice and/or registration of the same at the Copyright Office. Based on such dates, therefore, the work published for the first time in 1937 would be protected in the US until 1993 and, therefore, well after the USA's signing of the Berne Convention (1989). A similar consideration therefore applies all the more for all the works that were published for the first time on subsequent dates.

We can therefore state that in this case we may clearly apply all the provisions of this Convention, first of all the regulations implementing the principles of territoriality (according to which the protection regime for the works is determined by the regulations of the country in which they are used; in this case it is Italy, thus we must refer to Law no. 633 of April 22, 1941 as amended) and assimilation (according to which the EU Member States must apply to foreign authors and works the same protection granted by internal legislation for domestic authors/works). More so, similar considerations apply for the other subsequent Turner Cartoons and for colorized Warner Cartoons (with respect to which one of the co-authors, colorist Fred Ladd, is still alive).

7. In support of the validity and ownership of the plaintiffs in the proceeding, with reference to most of the films for which protection has been invoked, there is also another argument, founded on the principle of EU assimilation. Thus, for example, the order of the Court of Justice of 1/20/2009 C-240/07, in fact, provided (point 28) an interpretation of Art. 10, no. 2 of Directive 2006/116 in the sense that, based on this provision, Member States must grant the durations of protection under Directive 2006/16 to any work and subject, insofar as these, as of July 1, 1995, are protected in at least one member state. The order then goes on (point 35) to observe that, for a work or subject protected, as of July 1, 1995, in at least one Member State under the national provisions of that Member State, the fact that the owner of such protection is a citizen of a non-EU country and cannot make use, in the Member State in which the duration of protection specified under Directive 2006/116 is requested, of the protection under the national law of the Member State, is not determinant for purposes of applying Art. 10, no. 2 of this directive. What is important is, in fact, determining whether the work or the subject in question is eligible for protection as of July 1, 1995, under the national provisions of at least one Member State.

These indications apply with reference to this case where, protection having been granted to the films for which it was invoked in Germany starting from 1990 (see order of 2/8/2006 of the Court of Hamburg, under doc. N, plaintiffs), the same films are eligible for uniform protection in the entire European Union.

8. Having reconstructed and interpreted the significant regulatory picture as above, and thus having ascertained that the works in question are still subject to copyright according to Italian regulations, it is possible to continue to the assessment of Password's conduct in this context.

In its argument, Password has many times emphasized its good faith with respect to the belief that the VHS/DVD media that it produced and distributed had

© Copyright Giuffrè 2015. All rights reserved. VAT No. 00829840156

ITALIAN PROCEEDINGS                                                   **1571**

fallen into public domain. In support of this argument, Passworld referred to the content of the volumes "Film Superlist: Motion Pictures in the U.S. Public Domain" (excerpts under document 3, Passworld)—which however, as correctly noted by the plaintiffs, does not represent an official source—of the results of searches on the US Copyright Office database (see doc. 4) and the contract (doc. 1) with the proper assignor Reel (which remains in default). The contract with Reel, according to defendant Passworld, should represent a situation of assurance by Reel on the free availability and usability of the works in question.

In this regard, we cannot help but note how Passworld's statement certainly appears contradictory, given that, if a work had fallen into public domain, it would not be possible, and not even necessary, to acquire the rights to it from anyone. Equally, it would not be possible to give this type of exclusive guarantee, given the free appropriability of the work itself.

Furthermore, from a reading of the contract in question (doc. 1, Passworld file), actually provided in a difficult-to-read photocopy, which is signed by Reel on the first page only, lacking any other signature by the supposed licensee on the further additional pages, which in no way appear to be connected to the first page) the alleged assurances made by Reel appear to be anything but secure and reliable.

It is first of all significant that in this contract there is no list of the works that it refers to (doc. 1 refers to an "Attachment" which is missing from the records, with the list under doc. 3 being a list of Warner Cartoons that fell into public domain, with no relevance, even in the allegations of Passworld, to the contract with Reel), nor does it identify the geographical range of the alleged license (see foot of page 4).

Furthermore, in the contract, the statements made by Reel Media are actually vague and full of reservations: the films are licensed as being in the public domain in the US, but with the express urging to consult a trusted attorney to verify the legal status in the country of exploitation (see the printouts from the site www.realmediainternational.com, under doc. 2, Passworld), which clearly excludes any statement, assumption of responsibility, and/or guarantee by Reel Media with regard to the nonexistence of monopolies of third parties on the same cartoons outside of the USA, and therefore in Italy. Moreover, if on the one hand Reel Media (doc. 2, Passworld) states that, based on the Berne Convention, a film in the public domain in the country of origin would also be the same in any of the European Union member states (an incorrect theory, according to what has been demonstrated above), on the other hand, it refuses any responsibility in relation to the correctness of this statement, expressly conceding any opposite conclusions based on the legislation of various countries.

Defendant Passworld therefore cannot assume that the US company called into court, by which it claims to be guaranteed, had undoubtedly declared the actual and real legal status of the works in question in countries other than the United States, and that it had fully guaranteed its availability through itself and therefore for Passworld.

The overall situation should have induced Passworld, before proceeding to the activities in question here (reproduction, distribution, marketing, etc.), to make more accurate verifications and investigations on the subject, also in consideration of the fame of the cartoons in question and the renown of the characters, notoriously associated in the minds of consumers with the plaintiffs' companies. Even more so, a business operator like Passworld could not ignore the sensitivity of the matter and settle for itself the statements—however ambiguous—made by Reel.

Passworld's overall conduct thus appears to be manifestly negligent.

*913*

© Copyright Giuffrè 2015. All rights reserved. VAT No. 00829840156

**1571**        AIDA [Annali italiani del diritto d'autore (Italian Copyright Annals)] 2013

8.1 In light of the considerations set out on the content of the contract between Password and Reel Media, particularly with regard to the importance of the lack of determination of the essential elements of the contract (see the contract itself, missing the attachment related to the list of films allegedly licensed) this Panel Court cannot accept the request for guarantee submitted by Password to Reel Media. (Omitted).

10. Finally, with reference to the objections with regard to criminal significance, we find that the defendants Password, Moviemax, Cult Media, and CVC, having duplicated without authorization the animated films exclusively owned by the plaintiffs and distributing the video products (DVD and videocassettes) thus created, were accused of having also committed the illegal acts specified and penalized by Art. 171 ter, letter a) (with regard to Password), and c) of the Copyright Law (with regard to Moviemax, Cult Media, and CVC), making them consequently responsible for a serious act of piracy as well. The plaintiffs' argument assumes that the conduct of the defendants would also include the offense under Arts. 473 and 517 c.p. under the category of violation of trademarks owned by the plaintiffs.

Obviously, the criminal aspect will be assessed in the appropriate venue.

With regard to the acts of piracy, we must consider that Art. 144 c.p.i. defined as piracy the clear counterfeiting of registered trademarks, designs, and models and the violation of the industrial property rights of others carried out "willfully and systematically." Under this definition, the Panel Court rules out that in this case the conduct of Password and the other defendants can be thus categorized, since there is no element suggestive of willful misconduct. And, in truth, although we believe there to have been fraud, in the form of gross negligence, we must also deem the proof of fraud to be insufficient. We must also consider a possible uncertainty regarding the legal framework represented by the non-simple coordination between the significant Conventions, as well as the circumstance of Password having in any case requested and obtained the issuance of "stamps" from S.I.A.E.

11. The considerations made up to this point with regard to Password allow the involvement of the other defendant, Mondo Home Entertainment s.p.a. (MHE), now called Moviemax Media Group s.p.a. (Moviemax), in the liability to Warner and Turner. Below we will examine the positions of the companies summoned by MHE, Cine Video Corporation - CVC s.r.l., and Cult Media s.r.l., also active in the cinematographic sector.

11.1 The argument of Moviemax (previously MHE) stated its extraneousness to the offenses under these proceedings for having obtained the mandate to distribute films from Cine Video Corporation and Cult Media, which themselves had acquired it from Password, since the latter agreed to release them in any case from any harm.

Within its own distribution activities, Moviemax stated that it had received only works with S.I.A.E. stamps and that it had received notice only in 2006 of the fact that MediaWorld, its customer, had received from Warner notice of a legal dispute with Password.

After requesting a response from Cult Media and through it from Password, Moviemax stated that it had received a response that the works from the "Cartoon Show" series had already fallen into public domain and that there was no dispute with Warner.

Due to the failure to renew the supply with MediaWorld, Moviemax wrote Warner and Password complaining of damages suffered and asked Password to provide proof of their ownership of the rights. Password stated that Warner's rights were

© Copyright Giuffrè 2015. All rights reserved. VAT No. 00829840156

http://www.iusexplorer.it/iusexplorer/PrintExportSend

ITALIAN PROCEEDINGS                    **1571**

expired because they had not renewed the registration of their copyright.

Moviemax therefore asked to be excluded from these proceedings.

11.2 In the opinion of the Panel Court, the same considerations discussed above regarding Password's liability affirm the liability of Mondo Home Entertainment (now Moviemax). Indeed, the latter contributed by distributing and selling films from the "Cartoon Show" series in a manner that contributed to the production of the offense and its harmful effects upon the plaintiffs' companies.

Nor could the same have simply ensured that the works in question had fallen into public domain in the US without having verified the protectability of such works in Italy and/or the EU and without performing checks on the content of the video media that it helped distribute on the market. Simply viewing a sample would have allowed them to ascertain the improper "cuts" made to the films and the use, similarly and clearly not allowed, of the Warner trademark and "shield."

The extension of the petitions made by the plaintiffs against Mondo Home Entertainment (now Moviemax) as well as Cine Video and Cult Media therefore appear entirely well-founded.

11.3 With regard to the petition of Moviemax against Password, it should be noted that Moviemax did not—in the conclusions filed at the hearing of 6/26/2012—request indemnity against Password (having only made such requests against Cine Video and Cult Media), but requested that Password be ordered to compensate them for damages "in any case without prejudice to any other right and separate action for reimbursement of damages suffered as a consequence of the interruption of the marketing—against the plaintiffs, or Password s.r.l. unipersonal and/or Cult Media s.r.l., as announced with communication 9/6/2006 (doc. 11) at the end of the proceeding."

The Panel Court notes however on this point that the interruption of distribution of media in question occurred prudentially, as a proper action, and is certainly not an appropriate basis for ascertainments regarding the liability of Password with regard to Moviemax. The latter, in fact, was itself held directly responsible for the charges made by the plaintiffs' companies, so it cannot complain that it had to interrupt such illegal activity.

12. Examining the position of Cine Video Corporation, it is noted that it had stated that it signed a contract with Password on 5/22/2000, with which it assumed the exclusive ability to sell for five years the video recordings indicated in the text of the contract.

In the same contract, Password was declared the owner in Italy of the aforementioned films, with express commitment of indemnity.

The contract was terminated before its natural expiration, but CVC stated that, in the period of its validity, it had entrusted the sale of its products to Mondo Home Entertainment.

CVC declares therefore that it is extraneous to the events and submits a counterclaim for contractual and extracontractual liability against Password, which—it says—had also illegally placed the CVC logo on DVD/VHS packages.

12.1 Cult Media also acknowledges that it entered into a contract with Password and that it was the latter that guaranteed the ownership of the rights, where it stated

*915*

© Copyright Giuffrè 2015. All rights reserved. VAT No. 00829840156

**1571**        AIDA [Annali italiani del diritto d'autore (Italian Copyright Annals)] 2013

it had the right in any case to be indemnified by Passworld.

12.2 The Panel Court deems that the liability already formulated against Moviemax must be extended also to Cult Media and Cine Video Corporation for valid considerations against them as well with regard to the obligation, which they all equally had, to verify the free availability of the cartoons in question, as well as the clearly improper use of the trademarks and distinctive signs of the plaintiffs' companies, which already appeared on the covers of the media in question. Such use, in fact, finds no justification and this was clear, given the notoriety of the trademarks and the distinctive signs of the plaintiffs' companies, and given the activity carried out by the summoned third party companies in the sector of cinematographic distribution.

Therefore, the plaintiffs' petitions against Cult Media and Cine Video Corporation also merit acceptance.

The commitment assumed by Passworld to the latter (acknowledged by Passworld itself) allows the sentencing of Passworld to indemnify Cine Video and Cult Media from what they may be sentenced to pay as reimbursement for damages to the plaintiffs.

13. With regard to the position of S.I.A.E., it must be considered that its argument stated that it had stopped granting "stamps" to Passworld for the works in question and that it carried out an internal investigation on the ownership of the works. We therefore state that a ruling against it would be completely useless.

The Panel Court believes that undoubtedly the position of S.I.A.E. is completely different from those of the other defendant companies and/or those summoned to these proceedings. In fact, there has not been any other petition against it with respect to the injunction against the further release of "marks" ("endorsement stamps").

The Panel Court accepts a similar petition, considering that the purpose of the judgment is to prevent the conduct of S.I.A.E. from changing for any reason in the future.

The judgment with regard to S.I.A.E. can be considered final, with the exhibition order against it (requested by the plaintiffs) being in any case handed down (as by a separate order) as an order intended for a third party to the proceeding, under Art. 210 c.p.c.

With the finality of the judgment, we must also proceed to the regulation of the expenses between the plaintiffs and S.I.A.E., deeming that there are just causes to provide for full compensation between these parties for legal expenses.

14. In conclusion, all of the above allows us to accept the petitions of the plaintiffs formulated in relation to whether it is due, with particular regard to the ascertainment of the illegality of the operation carried out by Passworld, Moviemax, Cult Media, and Cine Video Corporation and to the joint sentence of the same to reimbursement of damages to the plaintiffs' companies (each for their particular portion, as will be determined later), being obligated to acknowledge that the request for sentencing to restitution of proceeds will be evaluated during the quantification of reimbursement. We also accept the further petition for injunction, with penalty (determined according to provision) and the order for publication of this order (using the methods according to provision), recognizing the immediate necessity of reestablishing correct information on the market, also in consideration of the fame of the cartoons in question. We do not currently accept the request for destruction of the media containing the animated films in question, since they could be used for

*916*

© Copyright Giuffrè 2015. All rights reserved. VAT No. 00829840156

http://www.iusexplorer.it/iusexplorer/PrintExportSend

ITALIAN PROCEEDINGS                                                     **1571**

purposes of quantification of reimbursement, the injunction order being sufficient to prevent their further distribution.

As indicated above, we must also accept the petitions for indemnity submitted by Cult Media and Cine Video Corporation against Passworld, while we reject the petition for damages submitted by Passworld against Moviemax. We find unacceptable the petition for indemnity submitted by Passworld against Reel Media International; as the latter has still failed to appear there is no call to rule on court expenses.

The proceedings must instead be sent back to investigation to complete the ascertainments in relation to the petitions on the amount, to be provided by separate order. (Omitted)

-----------

(1) The constitution (and exact legal appearance) of possession in relation to protected assets under the Copyright Law is a much-debated topic. The Copyright Law, in fact, contains no special rule on possession, since the latter institution, for purposes of copyright, should perhaps be reconstructed based on the general civil category consecrated in Art. 1140 c.c., which constitutes possession as the power over a thing, manifested in the exercise of an activity corresponding to the property right or other real right. The ability to apply civil possession to intellectual property rights has, however, been and remains the topic of much discussion, in light of the evident ontological diversity between the *res corporales* in relation to which the institution of possession was originally structured and exclusive rights protected by law on copyright. Many parties in fact have held that it is difficult in relation to the latter to constitute a real natural right (such as civil possession) and a factual power over the thing which that right translates into. As an extreme simplification, we can say that according to some opinions (indeed, for quite some time) it would be actually possible to align property with real rights with the consequent applicability to the former, though within certain limits, of typical institutions of material assets such as civil possession (see ASCARELLI, *Theory of competition and intangible assets*, Milan, Giuffré 1960, 318 et seq.; GRECO, *Intangible assets*, Nov. D. 365). Others believe that the differences between intangible and tangible assets are insurmountable (because the intangibility itself would make it difficult to constitute the exercise of an actual power and because the intellectual creation is susceptible to simultaneous and integral enjoyment by an undefined number of subjects) (see GITTI, *Possession of intangible assets and reversion of profits,* in this journal, 2000, 152 et seq; FRANCESCHELLI, *Monopolistic structure of institutions of industrial law, R.d. ind.* 61, 429 et seq.; MENGONI, *Purchase a non domino*, Milano 1994, 192). In line with this principle, we can say that, regardless of the exact dogmatic constitution of rights over intangible assets, today we allow that these can be the object of a relationship similar to the possession constituted by the civil code, though recognizing the impossibility of an integral and indiscriminate application of the regulations that govern the latter. For a rapid *excursus* on the various theories expounded on this topic over time, see TOSATO-GUARDAVACCARO, under Art.167 of the Copyright Law, in UBERTAZZI, *Brief commentary on*

*917*

© Copyright Giuffrè 2015. All rights reserved. VAT No. 00829840156

**1571**        AIDA [Annali italiani del diritto d'autore (Italian Copyright Annals)] 2013

*intellectual property law and competition*, Padua, Cedam 2012, 1900 et seq.), as well as Auteri, *The pledge of copyright: constitution and opposability against third parties*, in this journal, 2009, 141, with numerous references. Jurisprudence has solidified an orientation that constitutes the possession of intangible goods as the clear, obvious, and consolidated exploitation of the same (*nec vi, nec dam nec precario*) (see in this regard App. Milano March 30, 1999, in this journal 2000, *678* with extensive note by LAVAGNINI). The recurrence of the aforementioned circumstance of fact must be proved by the subject evoking the protection under Art. 167 of the Copyright Law (see Pret. Monza March 21, 1991, in this journal 1992, *40*; Court of Milan, order of July 11, 1996, *ivi* 1996, 429; Court of Rome, May 3, 2002, *ivi* 2003, 916). This published order is aligned with this orientation, recognizing as protectable under Art. 167 of the Copyright Law a situation of clear exploitation and use of the works in which the intellectual property rights are incorporated (in this case, with regard to animated cartoon characters).

(2) The colorizing of a cinematographic film originally in black and white is protectable as a derivative work under Art. 4 of the Copyright Law, according to which, without prejudice to the existing rights to the original work, the creative derivations of a work protected under the Copyright Law, such as translations into another language, transformations from one literary or artistic form into another, changes and additions that constitute a substantial reconstruction of the original work, adaptations, reductions, compendia, and changes do not constitute an original work. Such artistic expressions are united by their character as derivative works, that is, the fact of recovering from another pre-existing work one or more distinctive traits, so that the same is recognizable, adding to it however at least some differentiation (for a general illustration of the problems underlying the protection of derivative works see LAVAGNINI, in comment to Court of Turin, order of July 24, 1995, in this journal 1996, *401*; MUSSO, *Copyright on original, literary, and artistic works*, in *Scialoja-Branca Commentary on the Civil Code*, Bologna, Zanichelli 2008, 38 et seq.; BERTANI, *Copyright and related issues*, in *Intellectual property* edited by UBERTAZZI, Turin, Giappichelli 2011, 94 et seq.; DE SANCTIS, *Copyright*, in *Commentary on the Civil Code, founded by Piero Schlesinger and directed by Francesco Busnelli*, Milan, Giuffré, 2012, 35 et seq.; GALLI, under art. 4 of the copyright law, in UBERTAZZI, *Brief Commentary on Intellectual Property Law and Competition, cit.*).

The protectability of colorization of cinematographic films is, in doctrine and jurisprudence, a subject of analysis from various perspectives. Primarily discussed is the minimum gradient of creativity required to be able to benefit from copyright. In this regard, we rule out that colorization done by purely mechanical processes, such as the "*chromoloid*" system should be protectable, as it consists in the reproduction with an optical apparatus of three copies of the film in black and white into other colors (red, blue, and green) and in subsequent combinations in such copies to create a single film in color (see DE SANCTIS, *Film Colorization, IDA* 1995, 34 et seq.). Conversely, the colorization procedure that allows the human operator to artistically choose the colors for every character and scene is protectable (DE SANCTIS, *cit*). The order published here is substantially in line with this orientation: indeed, it recognizes the protectability of the work, arguing from the creative character of the colorization. From such recognition

*918*

© Copyright Giuffrè 2015. All rights reserved. VAT No. 00829840156

ITALIAN PROCEEDINGS **1571**

proceeds, as a further corollary, the qualification of the author of the colorization as a co-author of the work, also noted for the purpose of the determination of the duration of the protection, extended to 70 years from the death of the last co-author, under Arts. 26 and 32 of the Copyright Law.

Among the further problems connected to the colorization of cinematographic films, we recall those concerning the ability of the author of the cinematographic work to oppose the colorization, invoking his/her moral rights and the consequent ability to oppose any deformation, mutilation, or other modification of the protected work (see Art. 20 of the Copyright Law). In one famous case it was actually granted to the director (John Houston) the right to oppose the colorization of his film (*Asphalt Jungle*) (see App. Paris, October 21, 1992, in DE SANCTIS-FABIANI, *Copyright Contracts*, Milan, Giuffrè, 2007, 55 et seq.).

(3) The Court of Milan reaffirmed the ongoing validity of the Italy/United States agreement of October 28, 1892 (entered into force on the same date and ratified with Royal Decree of January 12, 1893, subsequently confirmed by the United States under Art. 33 of the peace treaty signed in Paris on February 10, 1947.) This agreement sanctions, as recalled in the maxim published herein, the full assimilation of American works to Italian works (and vice versa). The agreement is still in effect since, with the exception of Art. 20 of the Berne Convention for the protection of literary and artistic works of September 9, 1886, which grants to the signatory countries the right to enter into, amongst themselves, special agreements, since these confer to the authors more extensive rights than those granted by the Convention, that is, they contain other stipulations that are not in conflict with the same. A similar principle is sanctioned by Art. 19 of the Paris Convention of 1883 for the protection of industrial property. For an illustration of some problems of an international/private nature, inherent to copyright, see MASTROIANNI, *International Law and Copyright*, Milan, Giuffrè, 1997.

(4) The judges of the Court of Milan held that Art. 18 of the Berne Convention does not apply in cases where the fall into public domain was not due to the deadline of the duration of the protection, but to the failure to renew the formalities required for such protection. We recall that, in accordance with this regulation, all works that had not yet fallen to the public domain in the country of origin due to the expiration of the protection at the time that the Convention went into effect benefit from protection under the convention. The conclusion of the judges is based on a literal argument, that is, on the fact that the regulations under discussion make exclusive reference to falling into public domain due to the expiration of the term of the protection, and no other cases, such as the failure to renew the formalities for protection. On this point, see BERTANI, under Art. 18 of the Berne Convention, in UBERTAZZI, *Brief Commentary on Intellectual Property Law and Competition*, Padua, Cedam, 2007, 1436, with some doctrinal references; similarly GALTIERI, *International protection of literary and artistic works*, Padua, CEDAM, 1989, 92).

(5) Art. 144 c.p.i. defines acts of piracy as "the clear counterfeiting of registered trademarks, designs, and models and the violation of the industrial property rights of others carried out willfully and systematically." We are substantially dealing with acts of counterfeiting, which, due to the seriousness derived from their systematic and negligent nature,

*919*

© Copyright Giuffrè 2015. All rights reserved. VAT No. 00829840156

**1571**          AIDA [Annali italiani del diritto d'autore (Italian Copyright Annals)] 2013

merit particularly incisive sanctions, such as attachment under Art. 144-*bis*, introduced into our regulations by Directive 2004/48/EC (*Enforcement Directive*). It was, however, observed that the context of application of this directive was slightly broader, given that it is substantially applicable also to merely negligent offenses (see RONCAGLIA, *cit.*; by the same author, *Criminal and administrative sanctions against piracy*, in A. Vv. *The new C.P.I. project, Biotechnologies,* Proceedings of the AIPPI Convention held in Milan on February 17, 2006, Milan, Giuffré, 2007). On the subject of acts of piracy and related sanctions, see also VINCENTI, *Procedural protection of industrial and intellectual property*, Forlì, Experta, 2010, 379 et seq.; DI FAZZIO under Art. 144, in UBERTAZZI, *cit.* 661 et seq.; SCUFFI-FRANZOSI-FITTANTE (edited by), CODE OF INDUSTRIAL PROPERTY, Padua, CEDAM, 682 et seq. [Copyright Law]

© Copyright Giuffrè 2015. All rights reserved. VAT No. 00829840156